## In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3751

SERGIO ESCOBAR,

*Petitioner,*

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,                    *Respondent.*

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A095-905-213

ARGUED MAY 31, 2011—DECIDED SEPTEMBER 7, 2011

Before EASTERBROOK, *Chief Judge,* and WOOD and
TINDER, *Circuit Judges*.

WOOD, *Circuit Judge.* Sergio Escobar fled Colombia
after the Revolutionary Armed Forces of Colombia
(FARC, short for *Fuerzas Armadas Revolucionarias de
Colombia*) pursued him relentlessly, subjecting him to
multiple hijackings at gunpoint, directing death threats
at him and his family, and burning his trucks. Escobar
then applied for asylum, asserting that the government
sat by and allowed FARC to persecute him because
of his affiliation with the Liberal Party and his status as

a pro-government trucker who refused to cooperate with FARC. The Immigration Judge (IJ) found Escobar credible and determined that he was eligible for asylum. The Board of Immigration Appeals (Board) rejected the IJ's decision and ordered Escobar removed. As the Board saw it, Escobar had not endured persecution at the hands of FARC. Even if he had, the Board continued, his persecution occurred only because FARC wanted his trucking services, not because of his membership in any group recognized by the asylum statute. We conclude that the Board's finding that Escobar was not persecuted, or that if he was, that his persecution was not on account of the protected grounds of his membership in a particular social group and his political beliefs, failed to take account of all the evidence in the record. We therefore grant the petition for review and remand to the Board for further consideration of Escobar's case.

## I

Escobar is a Colombian national from the small town of Cerrito. He attended the university in the flourishing city of Cali. After receiving his degree in marketing, Escobar decided to pursue his dream of owning his own business, and so he bought two trucks to start a small transportation service. Unfortunately, Escobar soon crossed paths with FARC and his dream turned to nightmare.

Colombia has been ravaged by internal political and criminal conflict. The battle that rages has many different actors: the government's security troops, paramilitary groups, revolutionary guerrilla groups, and drug traf-

fickers. UNITED NATIONS HIGH COMMISSIONER FOR REFU-GEES, THE STATE OF THE WORLD'S REFUGEES ch. 7 (2006). One of the more powerful actors is FARC. Originally established to serve as the military wing of the Colombian Communist Party, it is now a free-standing leftist revolutionary organization attempting to over-throw the Colombian civil government. FARC is well-organized and sophisticated; in the areas under its control, FARC displaces civil government and rules on its own. Liz Harper, Colombia's Civil War: FARC, *available at* http://www.pbs.org/newshour/bb/latin_america/colombia/players_farc.html. Its tactics are brutal. FARC regularly kidnaps, ransoms, and assassinates local party officials and members. AMNESTY INTERNATIONAL, AMNESTY INTERNATIONAL REPORT 2011: THE STATE OF THE WORLD'S HUMAN RIGHTS 108-12 (2011); BUREAU OF DEMOCRACY, HUMAN RIGHTS, AND LABOR, 2009 HUMAN RIGHTS RE-PORT: COLOMBIA (2010), *available at* http://www.state.gov/g/drl/rls/hrrpt/2009/wha/136106.htm. This has led the United States to designate FARC as a Foreign Terrorist Organization. U.S. Dep't of State, Foreign Terrorist Organizations (May 19, 2011), *available at* http://www.state.gov/s/ct/rls/other/des/123085.htm. FARC spies on political party meetings in order to keep tabs on their affairs and identify members of influence and importance, some of whom will be future victims.

Escobar was an active member in Colombia's Liberal Party, one of the two parties that dominate the Colombian political establishment. Living in rural Colombia where transportation can be difficult to come by, Escobar often drove members of the Liberal Party to rallies and meetings. His service to the Liberal Party bore fruit, for

he obtained one of his principal trucking contracts, which was with a sugar refinery from Cauca, through his Liberal Party contacts. In March 1998, Escobar drove some Liberal Party members to and from a political meeting. It was there, Escobar believes, that FARC noticed him. After the meeting, five or six FARC members stopped Escobar at an improvised roadblock and threatened him at gunpoint that they would kill him if he did not transport their cargo. The leader of the FARC squadron told Escobar that from that point forward he was to serve FARC's transportation needs. He further warned Escobar that he would be killed if he refused to comply or reported the encounter to the authorities. In fear for his life, Escobar transported the cargo, after which FARC released him. Escobar followed orders and did not report this incident to the authorities. From that point, he tried to avoid further contact with FARC by taking alternate trucking routes.

This tactic worked only for a time. Some months later, Escobar again ran into FARC, was hijacked at gunpoint, and was forced to transport cargo to a distant FARC hideout. A few months later, he was hijacked a third time. This time, when approaching the FARC roadblock, Escobar unsuccessfully tried to maneuver around the FARC soldiers. This angered them and prompted them to threaten to kill Escobar and his family. After this encounter Escobar contacted the authorities. He filed a complaint with the Police Department of the city of Candelaria, but nothing came of it.

A few months later, Escobar learned that members of a paramilitary group that opposed FARC came to his

place of business in his absence. They suspected Escobar of collaborating with FARC and threatened to kill him. Caught in the middle of these rival forces, Escobar went into hiding. But FARC had not forgotten about him. FARC soldiers went looking for him, visiting his former home and place of business. They communicated to his friends and business contacts that he had better come out of hiding or else something ominous might happen to him or his trucks. Escobar believed this to be a trap; if he came out of hiding, he feared, he would be killed. He stayed in the shadows, but FARC made good on its threat by burning his trucks. Just to ensure that it made a lasting impression on Escobar, FARC also branded its insignia on the ruined vehicles.

Escobar immediately fled Colombia. He bought a plane ticket to Panama and from there traveled to the United States on a tourist visa. In early June 2000, he landed in Miami with permission to stay in the country until December 2000. While there, he spoke to a reporter for the *Miami Herald* about his interactions with FARC. The reporter put him in touch with agents of the Drug Enforcement Administration (DEA) who were interested in FARC's involvement with drug trafficking. Not familiar with U.S. immigration law, Escobar thought that his cooperation with the feds would allow him to remain in the United States as a legal resident. After receiving no further contact from the DEA, in mid-May 2002, Escobar filed an asylum application. In early August 2002, the former Immigration and Naturalization Service (now Citizenship and Immigration Services) issued Escobar a Notice to Appear and placed him under

removal proceedings pursuant to 8 U.S.C. § 1227(a)(1)(B). In the meantime, Escobar continued to assist U.S. law enforcement, meeting with FBI agents and providing details about the FARC members he had encountered.

On May 11, 2009, an Immigration Judge granted Escobar's asylum application. Though Escobar failed to file his application within one year of arriving in the United States, the IJ held that Escobar's asylum application could be processed because of changed circumstances. On the merits, the IJ found Escobar credible and concluded that he had been persecuted on account of two protected grounds: his political beliefs as a member of the Liberal Party, and his membership in the particular social group of truckers who refused to cooperate with FARC and collaborated with law enforcement. Finally, the IJ ruled that, contrary to the government's allegations, Escobar had not provided material support to FARC.

The government appealed the IJ's decision to the Board, which vacated the IJ's grant of asylum and ordered Escobar removed. The Board agreed with the IJ that Escobar's asylum application qualified for the exception to the one-year filing period because of changed circumstances, and it upheld the IJ's determination that Escobar was credible. Nevertheless, the Board did not think that Escobar had shown that he was persecuted. It reasoned that the burning of his trucks was a form of nonphysical, economic disadvantage insufficiently severe to be considered persecution. The Board added that even if Escobar was persecuted, any such persecu-

tion was not on account of his political beliefs or his membership in a particular social group. For these reasons, the Board concluded that Escobar was ineligible for asylum and ordered him removed. This petition for review followed.

## II

### A

To be eligible for asylum, an applicant must show that he is a refugee within the meaning of the Immigration and Nationality Act (INA). 8 U.S.C. § 1158(b)(1)(A); 8 C.F.R. § 1208.13(b). The INA defines a "refugee" as an alien who is "unable or unwilling to return" to the country of his nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 1208.13(b). The applicant must show that he fits within one of those categories and that there is "a nexus between his fear of future persecution and one of those five protected grounds." *Ishitiaq v. Holder*, 578 F.3d 712, 715 (7th Cir. 2009).

As usual, our standard of review for legal questions is *de novo*. *Vahora v. Holder*, 626 F.3d 907, 910 (7th Cir. 2010). Precedential opinions of the Board interpreting the governing legal standards, or non-precedential decisions of the Board that rely on applicable Board precedent, are entitled to *Chevron* deference. See *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984); see

also *Arobelidze v. Holder,* No. 10-2986, 2011 WL 3132459, at \*5 (7th Cir. July 27, 2011). Non-precedential decisions, such as the one the Board rendered in Escobar's case, are not. *Arobelidze,* 2011 WL 3132459, at \*6. Under *Chevron*, if Congress has directly spoken to the precise question at issue, then "that is the end of the matter": the court must follow that clear guidance. 467 U.S. at 842-43. If, on the other hand, the statute is silent or ambiguous, the court must defer to authoritative agency interpretations of the law. *Id.* at 844; see *United States v. Mead Corp.,* 533 U.S. 218, 231-33 (2001). Once the legal framework is established, the remaining task is to apply the law to the facts in the record. Our duty at this stage is to uphold the Board's determination if it is supported by substantial evidence. See *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). Under the substantial evidence standard, the agency's determination will stand if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole. *Vahora*, 626 F.3d at 910. The asylum applicant need demonstrate, with direct or circumstantial evidence, only that the persecutor was motivated "at least in part, by one of the enumerated [protected] grounds." *Gjerazi v. Gonzales*, 435 F.3d 800, 812 (7th Cir. 2006) (internal quotations omitted) (stating the pre-REAL ID requirement).

   In overturning the IJ's grant of asylum, the Board first determined that Escobar had not been persecuted at all. In coming to this conclusion, however, the Board inexplicably focused only on the burning of Escobar's trucks. Characterizing this as inflicting nothing more than an unfortunate economic disadvantage, the Board con-

cluded that the economic detriment was not severe enough to count as persecution. The Board then stated that, even if he had been persecuted, Escobar had not shown the requisite nexus between his putative persecution and a protected ground. In particular, the Board found that there was no evidence that FARC showed any interest in Escobar's political opinion—it just wanted his trucks at its disposal. Finally, the Board stated that Escobar's suggested social group did not meet the statutory criteria. It understood him to be arguing for a group consisting of truckers, and it rejected that group as one that reflected neither an immutable characteristic nor a characteristic that one should not be required to change as a matter of conscience.

We have no quarrel with the broad legal principles that the Board applied. Nevertheless, as we now explain, the Board failed to take all the facts into account or at least neglected to explain why it was disregarding key parts of Escobar's experience. We therefore cannot accord the normal weight to its application of these legal principles to the case before it. We look first at the question whether the government of Colombia can be held responsible for Escobar's persecution. Next, we consider whether the Board's factual finding that the mistreatment FARC inflicted on Escobar was not enough to amount to "persecution" was supported by substantial evidence. Third, we address the Board's conclusion that Escobar failed to prove his membership in either a social group or a group defined by political opinion. See 8 U.S.C. §§ 1101(42), 1158(b)(1)(B)(i). Finally, we discuss the Board's factual conclusion that Escobar failed to

prove a link between his persecution and his group membership.

## B

It was not the legitimate government of Colombia that mistreated Escobar; it was instead FARC, a powerful insurgent group that (as we mentioned earlier) has earned the designation of Foreign Terrorist Organization from the U.S. State Department. Normally, in order to obtain relief under the INA, persecution must be inflicted by the government; asylum is not offered for those who are unfortunate enough to be victims of ordinary crime or generalized chaos. Nevertheless, when a "government either condones [persecution by a private group] or is helpless to prevent it . . . the claim [for asylum] is a good one." *Hor v. Gonzales*, 421 F.3d 497, 501 (7th Cir. 2005). Given the strength of FARC in Colombia, its state-like status, its ongoing war with the Colombian government, and the impotence of the government over FARC, the "state action" element of Escobar's claim is easily met by the evidence showing that FARC has persecuted him. *Tapiero de Orejuela v. Gonzales*, 423 F.3d 666, 668-71 (7th Cir. 2005) (recognizing an asylum claim due to persecution by FARC). We do not see anything in the Board's opinion that takes issue with this point.

## C

The Board did express the view that the mistreatment Escobar suffered was not severe enough to amount to

persecution. Its opinion, however, presents what can charitably be called a sanitized view of the evidence. Here is what it said:

> The respondent was never physically harmed by the FARC. (Tr. at 140-141). The respondent testified that some people told him the FARC was looking for him and the FARC said that something could happen to him or his trucks if he did not reappear (Tr. at 93). When the respondent did not reappear, his trucks and a bulldozer were burned (Tr. at 94-95, 137).

As we have already explained, Escobar's case is based on much more than that. On three separate occasions, FARC members hijacked Escobar's truck, kidnapped him, and ordered him to do their bidding at gunpoint. Each time, they sent him off with a stern warning accompanied by a threat to his life and family. When he hid, they scoured the area looking for him, telling his friends that if he did not show himself they would kill him, kill his family, and destroy his trucks. When Escobar refused the bait, they made good on their threat: they burned his trucks and branded their call-sign on the wrecks. The Board never took that evidence into account. If it had a reason for thinking this part of FARC's mistreatment of Escobar irrelevant, we do not know what that reason is. Even though our review is deferential, "the [Board] may not simply overlook evidence in the record that supports the applicant's case." *Espinosa-Cortez v. Attorney General*, 607 F.3d 101, 113 (3d Cir. 2010), citing, *inter alia, Mema v. Gonzales*, 474 F.3d 412, 419 (7th Cir. 2007) ("An applicant for asylum is entitled to a rea-

soned analysis, not one which wholly disregards relevant, probative evidence.").

It is especially troubling that the Board said nothing about the threats of violence FARC made when Escobar did not come out of hiding. Threats can constitute persecution, if they are immediate, menacing, or the perpetrators attempt to follow up on them. *Nzeve v. Holder*, 582 F.3d 678, 683 (7th Cir. 2009). The IJ at least was convinced that the threats against Escobar were all immediate and menacing, as FARC would have killed Escobar had it discovered him. FARC showed its willingness to carry out its threats by burning his trucks in a public display. Even if we were to restrict ourselves to the truck-burning incident, the Board's analysis is incomplete. If FARC really just wanted Escobar's trucks, as the Board speculated, it would not have immolated them; it would simply have stolen them. Its burning of the trucks was not a simple economic blow to Escobar. It was a criminal act of arson designed to intimidate him, made all the more effective by also hurting him economically. See *Bazan-Reyes v. INS*, 256 F.3d 600, 608 (7th Cir. 2001) (stating that arson is a crime of violence for removal purposes); *cf. Virginia v. Black*, 538 U.S. 343, 388-89 (2003) (Thomas, J., dissenting) (discussing the intimidation caused by cross-burning). Escobar argues that the message was clear: we are burning your trucks today, and we will come after you and your family tomorrow if you do not cooperate with us. FARC's acts were ongoing, escalating in violence, and impossible for Escobar to evade. The Board's decision that they did not

qualify as persecution cannot stand without taking all of this evidence into account.

## D

In order to be entitled to asylum, Escobar must link his mistreatment to either his "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(42), 1158(b)(1)(B)(i). He argues that he satisfies both the "particular social group" and the "political opinion" categories. We first address his theory that he was persecuted for belonging to a particular social group. To qualify for asylum based on group membership, an alien must: (1) identify a particular social group; (2) establish that he is a member of that group; and (3) establish that his persecution or well-founded fear of persecution is based on his membership in that group. *Sharif v. INS*, 87 F.3d 932, 936 (7th Cir. 1996). The INA does not define "particular social group," but the Board has described it as a group whose members share "common characteristics that members of the group either cannot change, or should not be required to change because such characteristics are fundamental to their individual identities." *Gatimi v. Holder*, 578 F.3d 611, 614 (7th Cir. 2009) (quoting *In re Kasinga*, 21 I. & N. Dec. 357, 365-66 (BIA 1996)).

The group to which Escobar asserts that he belongs is defined as truckers who, because of their anti-FARC views and actions, have collaborated with law enforcement and refused to cooperate with FARC. Citing *Gatimi*, the Board found that this was not a "social group" because

a person can cease being a trucker, and once he has done that, it implied, he automatically will no longer be a trucker who has collaborated with law enforcement and refused to cooperate with FARC. *Gatimi*, 578 F.3d at 614. If Escobar had proffered the group "all truckers" as his proposed social group, we would have no trouble agreeing with the Board. But he did not, and the Board's assumption that he can shed the status of being a *former* trucker who resisted FARC and helped the government is incorrect. No more than the rest of us, Escobar cannot change the past. Just as former employees of Colombia's Attorney General's office constituted a "social group," see *Sepulveda v. Gonzales,* 464 F.3d 770, 772 (7th Cir. 2006), former truckers who resisted FARC and collaborated with the authorities can be a group.

The government also has another objection to Escobar's proposed group. In a nonprecedential disposition, *Poroj-Mejia v. Holder*, 397 F. App'x 234 (7th Cir. 2010), we noted that in many asylum cases where we have found social groups deserving protection, "the social groups exist independently of any relationship to the persecutor." *Poroj-Mejia v. Holder*, 397 F. App'x 234, 237 (7th Cir. 2010) (citing *Ramos v. Holder*, 589 F.3d 426, 428 (7th Cir. 2009); *Gatimi*, 578 F.3d at 613; and *Sepulveda*, 464 F.3d at 772). Seizing on this language, the government asserts the sweeping proposition that a proposed group fails to qualify as "social group" if it is not entirely independent of any relationship to the persecutor. Our statement, however, was not that broad. Beyond the fact that the quoted language comes from a non-

precedential order, the government ignores what we said immediately following that observation: "Where a proposed group is defined only by the characteristic that it is persecuted, it does not qualify as a 'social group.'" *Id.* at 237. The Board itself has never demanded an utter absence of any link to the persecutor; it has stated only that a "particular social group" is "a group of persons who share a common characteristic other than their risk of being persecuted . . . ." *In re C-A-*, 23 I. & N. Dec. 951, 956 (BIA 2006) (referencing the UN's definition of "particular social group").

Giving the Board the *Chevron* deference it is due, we accept the proposition that a "social group" cannot be defined solely by the fact that its members suffer persecution from the government or from a group that the government cannot or will not control. But we must still decide whether Escobar's proposed group, as a matter of fact, suffers from that flaw. We begin with the obvious point that just because all members of a group do experience persecution, that does not mean that this is the only thing that links them. The Board instructs us to examine whether the putative group's members share "common characteristics that members of the group either cannot change, or should not be required to change because such characteristics are fundamental to their individual identities." Sometimes that characteristic will be sexual orientation; sometimes that characteristic will be membership in an extended family; sometimes that characteristic will be a former association with a controversial group. Escobar was unlucky enough to have selected a profession—truck driving—that

was of particular interest to FARC, and then, rather than cooperate with or even join FARC, he resisted the terrorists and chose to help the government. We can assume that FARC has no special interest in people who privately deplore its activities but who have neither resources nor connections that it wants. But that is not Escobar's situation. Escobar falls into a group or class of people who have a special skill that FARC does not want to see used in the service of its enemies. It is impossible for him to change either this or the fact that he formerly rebelled against FARC's commands. This would be so even if he were to return to Colombia as a coffee farmer or a teacher.

The situation in *Poroj-Mejia* is distinguishable (although in light of its lack of precedential status it would not matter if it were not). Poroj-Mejia, a Guatemalan, sought withholding of removal because he was threatened by a violent criminal gang called Mara 18. *Poroj-Mejia*, 397 F. App'x at 237. He argued that he was part of the particular social group of those who have "sought police assistance against the Mara 18." *Id.* We rejected his argument, finding that the group he proposed had no common link apart from the characteristic that the members were persecuted. *Id.* As we have emphasized, that is not the case for Escobar's group.

The government also relies on *Pavlyk v. Gonzales*, 469 F.3d 1082 (7th Cir. 2006), to show that Escobar's group fails to meet the Board's criteria. *Pavlyk* involved a former Ukrainian prosecutor who investigated a local strongman on murder charges. *Id.* at 1085. This activity

led to death threats against him and his family. *Id.* Soon, the Ukrainian authorities charged him with the crime of accepting a bribe. *Id.* at 1086. He escaped to the United States and sought asylum based on his membership in the alleged social group of uncorrupt Ukrainian prosecutors. *Id.* at 1087-88. We ruled that Pavlyk had not demonstrated that he was being persecuted on account of his membership in this group. *Id.* at 1088. Rather it seemed he was persecuted because of his particular conduct in one criminal investigation against the strongman, not because of any group identity. *Id.* at 1089. The government contends that, as Escobar's group is defined by his collaboration with law enforcement against FARC, his is also not a particular social group.

But, unlike the situation in *Pavlyk*, Escobar has not described a "group" consisting of one person who conducted one controversial investigation. Nor, to repeat, is Escobar's group is defined solely by the fact that he is being persecuted for his collaboration with law enforcement. Escobar's theory, which the Board did not confront, is that FARC is persecuting him because he and those like him bring together a number of characteristics: skills as a trucker, support of the government, and opposition to FARC. (These are all traits of the victims, not of the persecutor, and thus they are the correct ones to use according to *Elias-Zacarias.* See 502 U.S. at 482.)

The biggest problem with all of the government's arguments is that they depend on teasing out one component of Escobar's group definition and then showing that this one part cannot satisfy the definition of a "social

group." But one could do that to a great number of social groups. In *Yadegar-Sargis v. INS,* 297 F.3d 596 (7th Cir. 2002), for instance, we found that Christian women in Iran who oppose the Islamic dress code for women were a "social group." *Id.* at 603. If we considered only the fact that group members oppose the dress code, we might reject the proposed group. People can easily change their clothing, after all. It was only when one adds in the religious dimension to the opposition that the outline of the group becomes clear. There, it was the combination of the religious trait and the opposition to the dress code that assured the integrity of the group. Similarly, former truckers in Colombia who support the government and oppose FARC also have a much more complex identity.

A final distinction between Escobar's group and the ones alleged in *Pavlyk* and *Poroj-Mejia* is worth pointing out. One might think that just as Escobar faces persecution as a trucker who opposed FARC, Pavlyk and Poroj-Mejia faced persecution for their opposition to similarly powerful criminal entities in their respective countries. But the latter two also failed because of a different initial hurdle: as we discussed earlier, private persecution is not grounds for asylum unless the state condones it or is helpless to prevent it. Nothing in *Pavlyk* and *Poroj-Mejia* indicates that the persecution was anything but ordinary criminal behavior that falls outside the scope of the asylum statute.

It would do Escobar no good to prove a social group if he were not a member of that group. But the record

could easily support a finding that he is. The Board found him credible, and it did not seriously question any of the elements that make up his group membership. The government asserts that Escobar acted only for reasons of self-preservation, not because of any fundamental commitment against FARC. It notes that Escobar testified that he transported goods for FARC because he was afraid of what it would do to him. This shows, the government argues, that he just belonged to the group of people who cooperated with FARC because they feared retaliation—and once again, it insists that this is not a group protected by the law.

This argument fails to come to grips with the details of Escobar's testimony. In the evidence that the Board failed to discuss, Escobar explained why he had been targeted and asserted that he transported goods for FARC because he feared immediate retaliation, as his head was pressed up against the unfriendly side of the barrel of a gun. Acting under threat of immediate execution does not suggest that one is unworthy of asylum. If anything, it reinforces his evidence of persecution. More importantly, Escobar is not saying that he has been persecuted because he *did* transport goods for FARC; he contends that he was and will be persecuted for *refusing* to transport goods for FARC. The government has no explanation for why he might have refused to cooperate. It would have been an odd way for Escobar to pursue self-preservation; acquiescence in FARC's every demand would have been much safer. The Board failed to explain why, in light of Escobar's strong ties to the anti-FARC Liberal Party, it could not find

that his resistance was motivated, at least in part, by his fundamental opposition to FARC and its goals.


E

The final question is whether Escobar can show the necessary nexus between his social group and the persecution FARC visited upon him. This is the point at which the various threads of Escobar's group come to-gether. We can assume that he would not be persecuted for being a former trucker alone. We can also assume that he would not be persecuted for privately held anti-FARC views. Escobar, however, cannot split himself into two people: he is a former trucker who is anti-FARC, and for this he has faced and will face persecution. Escobar's status as a former trucker explains how he first came in contact with FARC and why he found himself in FARC's cross-hairs. FARC aims to control the transportation network of Colombia. For that reason, according to Escobar's evidence, it targets truckers who are not already sympathetic to it. This, perhaps coupled with Escobar's Liberal Party membership, is what Escobar contends brought him to FARC's attention. (Escobar believes that FARC representatives spotted him taking people to and from a Liberal Party rally and attending that rally himself, although it is also possible that other facts that the Board did not address, such as his contracts with the sugar refinery or his complaints to the refinery security force and the police, may have played a part too.) Looking at the evidence as a whole, the Board might reasonably find that FARC's burning of

the trucks sent a powerful message that FARC has every intention of continuing to persecute him, that Escobar has refused to cooperate with FARC and has collaborated with law enforcement against it, and that FARC is known to murder informers and leave their bodies strewn on the roads as a warning to those who might consider crossing its path. Moreover, the evidence indicates that FARC is equipped with the sophisticated espionage techniques required to track its enemies expeditiously.

The Board concluded, based on the incomplete account of the facts it offered, that the only reason FARC targeted Escobar was for his trucking capabilities. But that makes no sense. Perhaps FARC was happy to take advantage of Escobar's trucking capabilities for a while. But if that is what it wanted more broadly, then it is hard to see why it would have torched the very trucks it wanted when Escobar managed to evade it. Once again, the Board must take all of these facts into account before reaching a final conclusion on the case. The facts taken as a whole might well lead the Board to conclude that FARC suppresses the public's support of the legitimate Colombian government by violently subjugating people who work within the system.

One might argue that FARC did not target Escobar because of his anti-FARC views. Instead, it pursued him only because he refused to cooperate, and this, the Supreme Court has stated, is insufficient for asylum. *Elias-Zacarias*, 502 U.S. at 483 ("Elias-Zacarias still has to establish that the record also compels the conclusion

that he has a 'well-founded fear' that the guerrillas will persecute him *because of* that political opinion, rather than because of his refusal to fight with them."). We use the subjunctive locution "might" for a reason: the government did not argue this and so this point is forfeited. But even if we considered the argument, Escobar has produced evidence to show that FARC targeted him because of a combination of his profession and his views, not because of a simple refusal to cooperate. Although it is ultimately up to the Board to decide what to make of this evidence, when everything is taken into account, there would be ample support for a finding that Escobar belongs to a particular social group; that he would be persecuted for his membership in that group; and, consequently, that he would be eligible for asylum protection.

F

Finally, we address Escobar's alternative argument that he was persecuted on account of his political opinion. The Board rejected this claim because it reasoned that FARC wanted Escobar only for his trucking capabilities. The latter explanation cannot be justified on the basis of the evidence in this record. The government argues additionally that FARC made no mention of Escobar's Liberal Party affiliation when confronting him, and thus his political opinion played no part in his persecution. But the evidence could support a finding that FARC spied Escobar at a Liberal Party meeting, and whether or not FARC spotted him there, it did hijack him after that very meeting. Escobar has pointed to a number of

facts that would suggest that his Liberal Party affiliation played some part in his persecution. We are not aware of any requirement that persecutors recite a bill of particulars while they are holding a gun to someone's head, and so we place little weight on the fact that the FARC thugs who kidnapped Escobar may not have mentioned his Liberal Party affiliation at that moment. It is also important to be precise about what political opinion Escobar was espousing. Escobar is a member of the Liberal Party, but he is also anti-FARC. We discussed above how this helps to define his particular social group, but it is also relevant to a political opinion claim. The Board's rejection of Escobar's contention that FARC knew of Escobar's political views and persecuted him at least in part on account of them must be reconsidered in light of all the evidence.

\* \* \*

It is not this court's job to resolve this petition definitively. The government requests that if we disagree with the grounds the Board presented, we remand to the Board to allow it to address the government's argument that Escobar is barred from a grant of asylum or withholding of removal because he allegedly provided material support to a terrorist organization and has been convicted of a particularly serious crime. We recognize that these issues may be addressed in further proceedings. For the reasons we have stated, however, we GRANT Escobar's petition for review and REMAND for further proceedings consistent with this opinion.

EASTERBROOK, *Chief Judge*, concurring in the judgment. My colleagues' discussion of the "social group" question is compatible with recent decisions in this circuit. As the Attorney General has not asked us to overrule these decisions, I concur in the result. But I am skeptical about this circuit's approach to the subject.

The Immigration and Nationality Act permits federal officials to grant asylum to aliens who seek refuge here "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion". 8 U.S.C. §1101(a)(42)(A). *INS v. Elias-Zacarias*, 502 U.S. 478 (1992), holds that a person mistreated by an insurgent group, or caught in a civil war, does not qualify under the "political opinion" part of this subsection unless the alien opposes the group for political reasons and those politics are why the group mistreated him. Escobar contended that his support of Colombia's Liberal Party caused Fuerzas Armadas Revolucionarias de Colombia to threaten him and burn his trucks, but the Board of Immigration Appeals found that FARC was indifferent to his politics. This finding led Escobar to contend that FARC had persecuted him on account of his membership in a "social group". His brief defines the group as "truckers who refused to cooperate with FARC and who collaborated with law enforcement authorities"—in other words, the same kind of conscripts who *Elias-Zacarias* held cannot claim automatic protection under the "political opinion" part of §1101(a)(42)(A).

What the Seventh Circuit has effectively done in this and other recent cases is read "because of . . . membership

in a particular social group" in a way that includes everyone threatened by rebels a nation's government cannot control, just as the Ninth Circuit in *Elias-Zacarias* had read "because of . . . political opinion" in a way that included everyone threatened by rebels. This makes eligible for asylum everyone who faces a substantial risk of harm in his native land, no matter the reason. The Convention Against Torture, S. Treaty Doc. 100-20, 1465 U.N.T.S. 85, see 8 C.F.R. §208.17 (2008), and the rules for withholding of removal, 8 U.S.C. §1231(b)(3), offer some protection to persons at risk of injury or death but require a higher burden of persuasion (proof by a preponderance of the evidence that future injury is more likely than not, see *INS v. Stevic*, 467 U.S. 407 (1984)) than does the asylum program (under which the alien need only establish a well-founded fear, see *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987)). See *Kobugabe v. Gonzales*, 440 F.3d 900 (7th Cir. 2006).

The Board of Immigration Appeals has established, in decisions that we must respect—see *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837 (1984), and *Gonzales v. Thomas*, 547 U.S. 183 (2006) (applying *Chevron* to the definition of "social group" in particular)—two requirements of social-group status. One is that membership in a "social group" entails classification by some immutable characteristic, or a characteristic so important that no one should be required to change it. *In re Kasinga*, 21 I. & N. Dec. 357, 365–66 (BIA 1996). The BIA applied its doctrine here by observing that being a trucker is mutable—and like other occupations is not a vital element of personality. People can and do change

jobs or sell one business and open another. This court nominally respects the agency's limitation of "social group" but has eviscerated it in practice. My colleagues redefine Escobar's social group as one that comprises everyone who has *ever* been a trucker who *ever* refused to cooperate with FARC. Events of a decade ago cannot be changed; thus the Board's primary defense against limitless expansion of "social group" vanishes. *Everyone* who seeks asylum in the United States can point to some event in the past, and as the past can't be changed this event becomes the basis for a claim based on an "immutable characteristic." See, e.g., *Sepulveda v. Gonzales*, 464 F.3d 770 (7th Cir. 2006) (former employees of a public agency are a social group); *Benitez Ramos v. Holder*, 589 F.3d 426 (7th Cir. 2009) (former gang members are a social group).

Redefining Escobar's "social group" as "truckers who in the past refused to cooperate with FARC and who formerly collaborated with law enforcement authorities" would not avoid the BIA's second bulwark: its rule that "social group" cannot be defined just by asking who the persecutors mistreated. *In re C– A–*, 23 I. & N. Dec. 951, 956 (BIA 2006). For if the persecutors' acts define a social group, then again §1101(a)(42)(A) effectively offers asylum to all mistreated persons, whether or not race, religion, politics, or some extrinsically defined characteristics (such as tribal membership) account for the persecution. And again this court professes to accept the Board's position. My colleagues write: "Giving the Board the *Chevron* deference it is due, we accept the proposition that a 'social group' cannot be defined solely

by the fact that its members suffer persecution from the government or from a group that the government cannot or will not control." Slip op. 15. But read to the end of the paragraph in which this sentence appears and see why my colleagues think that the "social group" that Escobar proposes—which, recall, uses refusal to collaborate with FARC *as part of the group's definition*—is not ruled out by the Board's principle: "Escobar falls into a group or class of people who have a special skill that FARC does not want to see used in the service of its enemies." If that's not defining "social group" by reference to the persecutor's selection criteria, I don't know what would be.

In sum, under this court's approach, any person mistreated in his native country can specify a "social group" in a circular fashion and then show that the mistreatment occurred because of membership in that ad hoc group. Anyone threatened or injured in the past, or who sought police protection, has an "immutable" characteristic (the past can't be changed), and the selection criteria used by the persecutor (here, people who own trucks and prefer not to give free transport to rebels, or more generally "have a special skill") become the defining characteristics of the "social group". The structure of §1101(a)(42)(A) unravels, and the distinction between asylum and withholding of removal (or the CAT) collapses.

Surprisingly, the agency has not asked us to revisit the line of cases that has led to today's decision. Indeed, the agency's brief does not even cite *Elias-Zacarias*.

Perhaps the Attorney General is relying on the fact that asylum is permissive, while withholding of removal is obligatory. Qualification under §1101(a)(42)(A) does not require the agency to grant asylum; it just makes an alien eligible for administrative discretion. Perhaps the agency plans to restore a functioning distinction among asylum, withholding of removal, and CAT by careful exercise of that discretion. But the judiciary still should keep these three categories distinct, and I think it unfortunate that this circuit has interpreted §1101(a)(42)(A) in a way that blurs the statutory lines.