In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-1989

JOHANA CECE,

*Petitioner,*

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A096 158 857

ARGUED OCTOBER 5, 2011—DECIDED FEBRUARY 6, 2012

Before EASTERBROOK, *Chief Judge*, and MANION and
ROVNER, *Circuit Judges*.

MANION, *Circuit Judge.* Johana Cece, a citizen of
Albania, petitions for review of a decision from the
Board of Immigration Appeals upholding the denial of
her application for asylum because she had not
established membership in a particular social group. Cece
argues on appeal that young Albanian women in danger

of being trafficked for prostitution constitute a social group. Her proposed group, however, is defined solely by the persecution feared by its members and lacks the type of common, immutable characteristics otherwise required of a particular social group. Moreover, substantial evidence supports the Board's conclusion that Cece has not established a well-founded fear of persecution if she returns to Albania. Accordingly, we deny the petition for review.

Cece, using a fake Italian passport, came to the United States in 2002 when she was 23 years old. Less than a year later, she applied for asylum and withholding of removal, asserting that she feared returning to Albania because she believed that, as a young woman living alone, she would be kidnapped and forced to join a prostitution ring. She also contended that the police in Albania would not protect her because she is an Orthodox Christian and supports the Democratic party, which was not in power at that time.

At a hearing before an immigration judge, Cece elaborated on the events that precipitated her flight from Albania. In 2001, "Reqi," the leader of a Muslim gang known for forcing women into prostitution, began harassing her. He invited her out for drinks, offered her rides in his car, and stalked her throughout the city. Cece ignored Reqi whenever he approached her, but once he followed her into a cosmetics store and pinned her against a wall for 20 minutes, demanding to know why she declined his advances. After Reqi left the store, Cece reported the incident to the police, who

took no action. Two days later, someone shattered a window in Cece's apartment with a rock.

Fearing that Reqi would kidnap her, Cece moved 120 miles north to live with her sister and teach in Tirana. There she felt safe until the following year, when her sister moved to the United States. Living alone once more, Cece explained that she feared that Reqi or another gang member would kidnap her and force her into prostitution, so she left the country. Using her fake Italian passport, she entered the United States under the Visa Waiver Program.[1] *See* 8 C.F.R. § 217.2.

Dr. Bernd Fischer, a professor of Balkan history at Indiana University, testified about the pervasive sex trafficking in Albania. He explained that the kidnapping of women for purposes of prostitution remains "a very serious problem," and that police often protect the responsible gangs. Reports issued from the U.S. Department of State in 2004 corroborate his representations. Gang members target women between the ages of 16 and 26, Dr. Fischer continued, and a single woman living alone would be particularly vulnerable to trafficking, especially if she previously had been pursued by a gang member. He also opined that, given the nationwide prevalence of trafficking, Cece would be unable to relocate safely within Albania.

The IJ granted Cece asylum in 2006. He concluded that she belonged to a particular social group comprised

---

[1]  Italy, but not Albania, is a participant in the program. 8 C.F.R. § 217.2(a).

of "young women who are targeted for prostitution by traffickers in Albania," and that the Albanian government was unwilling or unable to protect women such as her. But that decision was vacated by the Board, which rejected the notion that young Albanian women targeted for trafficking constitute a particular social group. The Board stated that not only was there no evidence that these women were socially visible in Albania, but these women also did not share "a narrowing characteristic other than their risk of being persecuted." The Board added that Cece had not established fear of future persecution because she showed that she could avoid any threat by relocating to a different part of Albania, such as Tirana.

On remand the IJ accepted the Board's conclusion that Cece had not identified a cognizable social group. Although the IJ suggested that Cece had established a subjective and objective fear of future persecution based on the pervasive kidnapping of young, single women in Albania, the IJ deferred to the Board's decision and denied her application. The Board dismissed Cece's appeal, emphasizing that Cece's proposed group was "defined in large part by the harm inflicted" on its members and did not "exist independently of the traffickers."

On appeal Cece argues that the Board erred in concluding that members of her proposed social group are united only by harm suffered in the *past*. Cece maintains that young women endangered by trafficking face a *present* danger of persecution, and thus form a social group without "reference to past persecution or prior problems."

Members of a social group, however, must share a common immutable or fundamental characteristic beyond the risk, past *or* present, of harm. *See Escobar v. Holder*, 657 F.3d 537, 545-46 (7th Cir. 2011); *In re Kasinga*, 21 I. & N. Dec. 357, 365-66 (BIA 1996). Thus, even if members of Cece's proposed group fear forced prostitution, a social group "cannot be defined merely by the fact of persecution" or "the shared characteristic of facing danger." *Jonaitiene v. Holder*, 660 F.3d 267, 271 (7th Cir. 2011) (concluding that government informants fearing retaliation do not form social group). And young Albanian women who fear being trafficked for prostitution have "little or nothing in common beyond being targets*." Gatimi v. Holder*, 578 F.3d 611, 616 (7th Cir. 2009). The Sixth Circuit rejected a nearly identical social group of Albanian women because its members did not share a narrowing characteristic other than the risk of being forced into prostitution. *Rreshpja v. Gonzales*, 420 F.3d 551, 555-56 (6th Cir. 2005). And although we have recognized that women who fear female genital mutilation constitute a social group, Cece has not presented evidence that sex trafficking poses the same particularized and inescapable threat to all young Albanian women. *See Agbor v. Gonzales*, 487 F.3d 499, 502 (7th Cir. 2007); *Hassan v. Gonzales*, 484 F.3d 513, 518 (8th Cir. 2007). Nor has she demonstrated that trafficking is "deeply imbedded" in Albanian culture. *See Mohammed v. Gonzales*, 400 F.3d 785, 797-98 (9th Cir. 2005); *see also Sarhan v. Holder*, 658 F.3d 649 (7th Cir. 2011) (recognizing women facing honor killings as social group); *see Safaie v. INS*, 25 F.3d 636, 640 (8th Cir. 1994), *superseded*

*by statute on other grounds*, Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (concluding that Iranian women subject to harsh restrictions do not form social group).

Even if Albanian women endangered by trafficking could be labeled as a particular social group, Cece still would face a number of obstacles. As an initial matter, she could have been ejected summarily when her fraudulent entry to the United States was discovered. *See Bayo v. Napolitano*, 593 F.3d 495, 505-06 (7th Cir. 2010) (en banc) (discussing appropriate handling of aliens who enter under false claim of eligibility to participate in Visa Waiver Program). Moreover, substantial evidence supports the agency's conclusion that Cece has not established an objective fear of future persecution on account of her membership in the group. She bases her claim on aggressive advances made by a gang member coupled with a broken window in her apartment. Cece reported no specific or ongoing threat, however, and the past harassment she detailed does not demonstrate that she would be singled out for persecution if she returns to Albania. *See Nzeve v. Holder*, 582 F.3d 678, 684-85 (7th Cir. 2009); *Ahmed v. Ashcroft*, 348 F.3d 611, 618 (7th Cir. 2003). Nor has Cece met her burden of showing that she could not relocate safely within Albania. 8 C.F.R. § 1208.13(b)(3)(i). She relies heavily on Dr. Fischer's opinion that "her location would be discovered" if she returned to Albania. But Cece herself testified that in 2001 she moved to Tirana, where she worked as a teacher and was not contacted by gang members. The record thus provides sufficient evidence

for the Board's determination that Cece can relocate safely within Albania. *See Oryakhil v. Mukasey*, 528 F.3d 993, 998 (7th Cir. 2008); *Tendean v. Gonzales*, 503 F.3d 8, 11 (1st Cir. 2007).

Accordingly, we DENY Cece's petition for review.

ROVNER, *Circuit Judge,* dissenting. The majority order rejects Cece's social group as being one that is defined solely by the harm its members suffer. Although it is true that "where a proposed group is defined only by the characteristic that it is persecuted, it does not qualify as a 'social group,'" the Board of Immigration Appeals has never required complete independence of any relationship to the persecutor. *Escobar v. Holder*, 657 F.3d 537, 545 (7th Cir. 2011). Just because all members of a group suffer persecution, does not mean that this characteristic is the only one that links them. *Id.* at 545-46. A social group "cannot be defined *merely* by the fact of persecution" or "*solely* by the shared characteristic of facing dangers in retaliation for actions they took against alleged persecutors." *Jonaitiene v. Holder*, 660 F.3d 267, 271-2 (7th Cir. 2011) (emphasis added). But such a fact does not disqualify an otherwise valid social group. *Escobar*, 657 F.3d at 547 (instructing that we

cannot tease out one component of the group's charac-
teristics to defeat the definition of social group.) The
Board's cases instruct that we must look to see whether
the group shares "common characteristics that members
of the group either cannot change, or should not
be required to change because such characteristics are
fundamental to their individual identities." *Id.* at 545
(quoting *In re Kasinga*, 21 I. & N. Dec. 357, 365-66 (BIA
1996)). In this case, although it is true that these women
are linked by the persecution they suffer—being targeted
for prostitution—they are also united by the common
and immutable characteristic of being women between
the ages of sixteen and twenty-seven who meet the
profile of the traffickers.

In *Escobar*, the social group at issue was defined as
former truckers (or, more generally, those with a special
skill needed by the persecutors) who resisted a powerful
insurgent group and collaborated with authorities.
This court deemed these characteristics unchangeable
because Escobar could not alter his past actions or skills.
In short, although the group may share the common
experience of being targets of persecution, the members
of that group may also share another trait that renders
them a cognizable social group for asylum purposes. That
characteristic might be membership in an extended
family, sexual orientation, a former association with a
controversial group, or membership in a group whose
ideas or practices run counter to the cultural or social
convention of the country. In this latter group we find
women who are opposed to and fear female genital
mutilation, *Agbor v. Gonzales*, 487 F.3d 499, 502 (7th Cir.

2007); women who "in accordance with social and religious norms in Jordan, are accused of being immoral criminals and, as a consequence, face the prospect of being killed without any protection from the Jordanian government," *Sarhan v. Holder*, 658 F.3d 649, 654 (7th Cir. 2011); or Christian women in Iran who do not wish to adhere to the Islamic female dress code, *Yadegar-Sargis v. INS,* 297 F.3d 596, 603 (7th Cir. 2002). This court's recent opinion in *Sarhan* lists many other examples of social groups, included among them children who escaped after being enslaved by Ugandan guerillas, women who are sold or forced into marriage and involuntary servitude, and landowning cattle farmers targeted by Columbian rebels. *Sarhan*, 658 F.3d at 655.

Human trafficking in general and forced prostitution specifically are serious, devastating, and widespread problems. This, however, does not mean that every young person or woman in the world who has a generalized fear of human trafficking has a viable claim for asylum in this country. Cece's claims were very specific. Because of her family circumstances, she was left to live alone in a country where it is uncommon for women to do so. She was, at that time, within the age range of young women who are seen as good candidates for forced prostitution. She was targeted by the leader of a gang known for harassing, threatening, and trafficking women. That leader stalked and harassed her, at one point pinning her against a wall and threatening that he would not be stopped. Cece went to the police, but they refused to help. Cece's expert testified that forced prostitution is pervasive in Albania because of political

instability, because the police turn a blind eye, and perhaps most importantly, because the police and government themselves are frequently the ones involved in trafficking. (*See, e.g.*, R. 224-28). According to the expert, Albania is also unique among the other Balkan states and Europe because in many ways it still has not completed its transition from a closed Communist society to an open market economy, because the rule of law has not yet been established, and because of pervasive political and economic instability. (R. 232). Furthermore, according to Cece's own expert, women age out of the targeted category at a still rather young and predictable age—twenty-six or twenty-seven—another factor unique in asylum claims.

Cece maintains that she faces a present danger of persecution, but the testimony of Cece's own expert is that the group of threatened women in Albania is composed of women who are between the ages of sixteen and twenty-six (perhaps twenty-seven) who live alone. Cece is now in her early thirties and clearly no longer a member of the group defined by her own expert. Although her expert testified that there are people outside this age range who are being kidnaped and trafficked, he did not explore in any detail the factors that might make someone outside of this group a target. (R. 255). Cece's circumstances have changed in such a way that we must now evaluate whether her life or freedom would still be threatened in Albania. *See* 8 C.F.R. § 1208.16(b)(i)(A).

The majority also claims that the record provides sufficient evidence for the Board's determination that Cece

can relocate safely within Albania. The Board, however, failed to take account of the fact that Cece relocated to Tirana without incident, but only when she lived with her sister there—a sister who now lives in the United States. (R. 9, 330). *See also* (R. 145, 170-71, 173). Cece's claim is that women who live alone, without the protection of family, are subject to human trafficking. On remand, the immigration judge noted that the Board's conclusion that Cece could relocate within Albania was inconsistent and not supported by the only evidence on the matter, but that he was forced to follow the Board's conclusion nevertheless. (R. 118-20).

I would remand to the immigration judge to determine whether Cece has a viable claim that she will remain a target of forced prostitution if she returns to Albania. Therefore, I respectfully dissent.