ROVNER, Circuit Judge.
United States asylum laws grant refuge to those who have been persecuted in foreign lands because of race, religion, nationality, membership in a particular social group, or political opinion. The complexity surfaces when we try to define terms such as persecution and “social group”— the latter of which has perplexed this court and others, and is in the spotlight once again in this case.
I.
Johana Cece, a native of Albania, arrived in the United States in 2002, and sought asylum within the requisite time allotted. The immigration judge deemed Cece credible, and therefore we use her testimony and the immigration judge’s factual findings as a basis to set forth the facts of the case.
Cece lived with her family in Korgé, Albania until her parents left the country in 2001. As a young woman living alone in Albania, Cece caught the attention of a well-known local criminal gang that was notorious for forcing women into prostitution rings. One of the leaders of that gang, a man Cece knew as “Reqi,” began following her around town, offering her rides, and inviting her on dates. Cece knew Reqi by reputation — that is, for his membership in a gang known for its participation in prostitution rings, murder of other gang members, and the drug trade. Cece also testified that the gang members appeared to enjoy complete immunity from the law. Cece had long seen Reqi near her high school, where he cruised the area looking for girls and offering drugs to young women. Cece had heard that one of these women had been kidnapped by Reqi and forced into prostitution. Reqi’s stalking culminated in a confrontation on June *667 4, 2001, when Reqi followed Cece into a cosmetics store, cornered her, and pinned her to a wall. There he confronted her and asked her why she would not go out with him. Reqi made it clear to Cece that he could not be stopped and that he would find her and do whatever he wanted to her. She told him to let go, but he merely tightened his grip and held her there. There were several people in the store, but no one came to her aid. Cece surmised that they too were frightened by Reqi. Cece’s friend convinced her to report the assault to the police, but the police perfunctorily dismissed her accusation, claiming she lacked proof.
A few days later someone threw a rock through Cece’s window. She stopped going out, stopped going to school, and made plans to leave Korgé.
Cece moved 120 miles north to Tirana to stay with her sister, who lived in a university dormitory, but her safety there was short-lived. A year later, her sister left the country and, without access to the dormitory or family with whom to live, Cece was once again left alone to fend for herself. As a single woman living alone in Albania, Cece claims she remained a target no matter where she lived.
In 2002, fearing for her safety, Cece fraudulently procured an Italian passport and came to the United States under the Visa Waiver Program. Less than a year later, she applied for asylum and withholding of removal, asserting that she feared returning to Albania because she believed that as a young woman living alone she would be kidnapped and forced to join a prostitution ring.
At Ceee’s hearing, Dr. Bernd Fischer, a Professor in Balkan History at the Indiana University-Purdue University Fort Wayne and an expert on Albania, testified that Cece’s experience was “unfortunately usual.” (R. 223). Dr. Fischer described a very serious problem of human trafficking for prostitution in Albania in which gangs, often with the protection, and at times the participation of the police, kidnap women and spirit them out of the country either through Greece, Kosova, or across the Adriatic Sea to Italy. Dr. Fischer described how anomalous it is for a single woman to live by herself in Albania, that such a woman would be an ideal target for a trafficker, particularly if she had been such a target in the past, and that the problem was pervasive throughout Albania and not limited to Cece’s home village of Korgé. Dr. Fischer testified that although gang members primarily target women between the ages of sixteen and twenty-six, many women outside of the target age range are also forced into prostitution. Finally, he noted that the Albanian judicial system does not adequately enforce laws against traffickers. Reports issued by the U.S. State Department in 2004 corroborated his representations of a large-scale problem with human trafficking in Albania. (R. 573-84).
The immigration judge granted Cece asylum in 2006, concluding that she belonged to the group of “young women who are targeted for prostitution by traffickers in Albania,” and that the Albanian government was unwilling or unable to protect such women. (R. 128-29). He noted in particular that Albania stands out in Europe as a major country of origin of traffickers in prostitution; the government’s judicial system is not effective against the problem; Albania suffers from a major and ongoing trafficking of young women by gangs; and there is no prospect in the foreseeable future of the government being able or willing to address the problem. (R. 129). The immigration judge also found Cece’s testimony credible and her fear reasonable.
*668 The Board of Immigration Appeals vacated the decision of the immigration judge, however, finding that Cece failed to establish past persecution and had successfully relocated within Albania. (R. 330-31). Specifically, the Board held that the immigration judge erred in determining that Cece was a member of a social group of young women who have been targeted for prostitution by traffickers, noting its precedent that a social group must have social visibility and share a narrowing characteristic other than the risk of being persecuted.
On remand, the immigration judge expressed concern with the Board’s conclusion that Cece did not belong to a protect-able social group and that she could safely relocate within the country. (R. 114-116, 119-120). The immigration judge, however, recognized that he was bound by the Board’s determinations and denied the application for asylum. The Board dismissed Cece’s second appeal, emphasizing that Cece’s proposed group was defined in large part by the harm inflicted on its members and did not exist independently of the traffickers.[1] The Board also concluded that there was insufficient evidence in the record that internal relocation was not reasonable. (R. 9).
Cece appealed to this Court and over one dissent, the panel denied Cece’s petition for review, agreeing with the Board that Cece had not named a cognizable social group and that the Board had sufficient evidence to conclude that Cece could relocate safely within Albania. We granted Cece’s petition for rehearing en banc and vacated the panel’s opinion and judgment.
II.
To be eligible for asylum, an applicant must show that she is “unable or unwilling to return” to the country of his nationality “because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.” 8 U.S.C. § 1101(a)(42)(A). An applicant who successfully proves that she was subject to past persecution is presumed to have a well-founded fear of future persecution, which the Attorney General can rebut by demonstrating a change in conditions in the applicant’s home country. 8 C.F.R. § 1208.13(b)(1); Mustafa v. Holder, 707 F.3d 743, 750-751 (7th Cir.2013). The applicant must show that she fits within one of those categories and that there is “a nexus between her fear of future persecution and one of those five protected grounds.” Escobar v. Holder, 657 F.3d 537, 542 (7th Cir.2011); Ishitiaq v. Holder, 578 F.3d 712, 715 (7th Cir.2009).
The primary question in this case is whether Cece has proffered a particular social group that is cognizable under 8 U.S.C. § 1101(a)(42)(A). Whether a group constitutes a particular social group under the Immigration and Nationality Act is a question of law that we review de novo, while giving Chevron deference to the Board’s reasonable interpretation set forth in precedential opinions interpreting the statute. Chevron, U.S.A., Inc. v. Natural *669 Resources Def. Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); Escobar, 657 F.3d at 542. See also, Ayala v. Holder, 640 F.3d 1095, 1096-97 (9th Cir.2011) (whether a group constitutes a particular social group under the Immigration and Nationality Act is a question of law, which a court of appeals reviews de novo); Castaneda-Castillo v. Holder, 638 F.3d 354, 363 (1st Cir.2011) (same); Crespin-Valladares v. Holder, 632 F.3d 117, 124 (4th Cir.2011) (same); Gomez-Zuluaga v. Att’y Gen. of United States, 527 F.3d 330, 339 (3d Cir.2008) (same); Malanga v. Mukasey, 546 F.3d 546, 553 (8th Cir.2008) (same); Castillo-Arias v. United States. Att’y Gen., 446 F.3d 1190, 1195 (11th Cir.2006) (same); Cruz-Funez v. Gonzales, 406 F.3d 1187, 1191 (10th Cir.2005) (same).
 Under the deference analysis set forth in Chevron, if congressional purpose is clear, we must give it effect. Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778. We also give deference to precedential decisions of the Board. Id. at 843, 104 S.Ct. 2778; Escobar, 657 F.3d at 542. Our duty at this stage is to uphold the Board’s determination if it is supported by substantial evidence — that is, reasonable, substantial, and probative evidence on the record considered as a whole. Escobar, 657 F.3d at 545. If Congress has directly spoken to the precise question at issue, then a court must follow that clear guidance. Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778. If, however, the statute is silent or ambiguous, the court must defer to authoritative agency interpretations of the law. Id. at 844, 104 S.Ct. 2778. Congress did not directly address what it meant by a protected “social group” in the Immigration and Nationality Act, so we look to see how the agency has interpreted the statute.
The Board took on the task of defining “social group” in Matter of Acosta, 19 I. & N. Dec. 211, 233-34 (1985), overruled, in part, on other grounds by Matter of Mogharrabi, 19 I. & N. Dec. 439, 439 (BIA 1987) limiting it to groups whose membership is defined by a characteristic that is either immutable or is so fundamental to individual identity or conscience that a person ought not be required to change. Id. This Circuit has deferred to the Board’s Acosta formulation of social group. See Lwin v. INS, 144 F.3d 505, 512 (7th Cir.1998).
The immutable or fundamental characteristic might be membership in an extended family, sexual orientation, a former association with a controversial group, or membership in a group whose ideas or practices run counter to the cultural or social convention of the country. The latter group might seem plausibly alterable, but we respect an individual’s right to maintain characteristics that are “fundamental to their individual identities.” Escobar, 657 F.3d at 545. Cece could find a man to marry to protect her (and anachronistically, the lawyer representing the government in this case inquired why she had not done just that (R. 172)), but this is the type of fundamental characteristic change that we do not ask of asylum applicants. See, e.g., Agbor v. Gonzales, 487 F.3d 499, 502 (7th Cir.2007) (women who are opposed to and fear female genital mutilation); Sarhan v. Holder, 658 F.3d 649, 654 (7th Cir.2011) (women who “in accordance with social and religious norms in Jordan, are accused of being immoral criminals and, as a consequence, face the prospect of being killed without any protection from the Jordanian government.”); and Yadegar-Sargis v. INS, 297 F.3d 596, 603 (7th Cir.2002) (Christian women in Iran who do not wish to adhere to the Islamic female dress code). See also Al-Ghorbani v. Holder, 585 F.3d 980, 996 (6th Cir.2009) (social group that opposes the *670 repressive and discriminatory Yemeni cultural and religious customs that prohibit mixed-class marriages and require paternal consent for marriage); Safaie v. INS, 25 F.3d 636, 640 (8th Cir.1994) (Iranian women who advocate women’s rights or who oppose Iranian customs relating to dress and behavior);[2] Fatin v. INS, 12 F.3d 1233, 1241 (3d Cir.1993) (Iranian women who refuse to conform to the government’s gender-specific laws and social norms).
Members of a social group need not be swimming against the stream of an embedded cultural norm. Sometimes the characteristic is immutable because a shared past experience or status has imparted some knowledge or labeling that cannot be undone. Acosta, 19 I. & N. Dec. at 233. Thus we have held that former truckers (or, more generally, those with a special skill needed by the persecutors) constitute a social group because their past actions and acquisition of skills are unchangeable, Escobar, 657 F.3d at 545-46; as do the subordinates of the attorney general of Colombia who had information about insurgents plaguing that nation, Sepulveda v. Gonzales, 464 F.3d 770, 771-72 (7th Cir.2006); former members of a violent and criminal faction in Kenya, Gatimi v. Holder, 578 F.3d 611, 614 (7th Cir.2009); tattooed, former Salvadoran gang members who had since turned to God, Benitez Ramos v. Holder, 589 F.3d 426, 428-29 (7th Cir.2009); parents of Burmese student dissidents, Lwin, 144 F.3d at 512; and the educated, landowning class of cattle farmers targeted by Columbian rebels, Tapien de Orejuela v. Gonzales, 423 F.3d 666, 672 (7th Cir.2005). See also Lukwago v. Ashcroft, 329 F.3d 157, 178 (3d Cir.2003) (former Ugandan child soldiers who have escaped abduction, enslavement and torture).
In order to compare Cece’s social group with the likes of those above, we must first determine the contours of her social group. Both the parties and the immigration courts were inconsistent, and the description of her social group varied from one iteration to the next. The inconsistencies, however, do not upset the claim. See In re Kasinga, 21 I. & N. Dec. 357 (BIA 1996) (the Board, recognizing that both the Immigration and Naturalization Service and the applicant “advanced several formulations of the ‘particular social group’ at issue”). And in one form or another, both Cece and the immigration judge articulated the parameters of the relevant social group.
On her application for asylum, Cece explains that she is a “perfect target” of forced prostitution because she is a “young Orthodox woman living alone in Albania.” (R. 669). The immigration judge, in initially granting Cece asylum, collapsed this definition and described her social group as first, “a social group consisting of young women who are targeted for prostitution by traffickers in Albania,” (R. 128) and then a “social group consisting of women in danger of being trafficked as prostitutes.” (R. 131). Thus the immigration judge omitted the important characteristic that Cece lived alone.[3] There is no doubt that it should have been included in the immigration judge’s description of social *671 group, as so much of the testimony before him centered on Cece’s status as a woman living alone. Cece testified at length that women do not live alone in Albania (R. 147-148, 167, 195, 674), that she did not know anyone who lived alone (R. 167, 173,-195, 207); that she was afraid to live alone, (167, 171, 197, 300, 674) and most importantly that she was targeted because she was living alone. See (R. 147-148, 158, 166, 172-73, 195, 197, 300, 304, 305). Similarly, the Albanian expert’s testimony was focused on the risk of women who lived alone in Albania. (R. 229-30). Cece’s brief before this Court noted several times that the Board failed to consider this formulation of the group. Opening Brief of Appellants before the three-judge panel of this Court, at 20, 22, 27.
We could surmise that the immigration judge’s description of Cece’s social group as one consisting of “young women who are targeted for prostitution by traffickers in Albania,” (R. 128) or “women in danger of being trafficked as prostitutes,” (R. 131) was simply shorthand for describing women who are vulnerable to trafficking. And we know that women in Albania become vulnerable to targeting when, for example, they lack protection from husbands and family members. We need not do too much surmising, however, because the immigration judge’s order on remand — and really the only order that matters on this appeal — specifically concludes that her characteristics are “namely that she is a young woman from a minority religion who has lived by herself most of the time in Albania, and thus is vulnerable, particularly vulnerable to traffickers for this reason.” (R. 120) (emphasis ours).[4]
The Board’s order rejects Cece’s social group as being not cognizable under the Act because it “is defined in large part by the harm inflicted on the group, and does not exist independently of the traffickers.” (R. 9). This is not a reasoned conclusion. As we have just described, the characteristics of the group consist of the immutable or fundamental traits of being young, female, and living alone in Albania. Even if the group were defined in part by the fact of persecution (and we do not believe it to be), that factor would not defeat recognition of the social group under the Act. Although it is true that “where a proposed group is defined only by the characteristic that it is persecuted, it does not qualify as a ‘social group,’ ” the Board of Immigration Appeals has never required complete independence of any relationship to the persecutor. Escobar, 657 F.3d at 545 (emphasis ours). And just because all members of a group suffer persecution, does not mean that this characteristic is the only one that links them. Id. at 545-46. A social group “cannot be defined merely by the fact of persecution” or “solely by the shared characteristic of facing dangers in retaliation for actions they took against alleged persecutors.” Jonaitiene v. Holder, 660 F.3d 267, 271-72 (7th Cir.2011) (emphasis ours). That shared trait, however, does not disqualify an otherwise valid social group. Escobar, 657 F.3d at 547 (instructing that we cannot tease out one component of the group’s characteristics to defeat the definition of *672 social group). It certainly did not invalidate the social group in Agbor which consisted of “women who fear being circumcised should they return to their home countries,” despite the fact that the group was defined in large part by the persecution inflicted on the group. Agbor, 487 F.3d at 502. Nor did it disqualify “women in Jordan who have (allegedly) flouted repressive moral norms, and thus who face a high risk of honor killing.” Sarhan, 658 F.3d at 654, 655. These women still had the immutable characteristics of gender, nationality, and the inability to alter their past labels of non-conformist.
“Women who fear female genital circumcision” sound a lot like “women who fear prostitution,” thus demonstrating that it is not fair to conclude that the group is defined by the harm or potential harm inflicted merely by the language used rather than determining what underlying characteristics account for the fear and vulnerability. The Board’s cases instruct that we must look to see whether the. group shares “common characteristics that members of the group either cannot change, or should not be required to change, because such characteristics are fundamental to their individual identities.” Escobar, 657 F.3d at 545 (citing Gatimi, 578 F.3d at 614, In re Kasinga, 21 I. & N. Dec. 357, 365-66 (BIA 1996)). In this case, although it is true that these women are linked by the persecution they suffer — being targeted for prostitution — they are also united by the common and immutable characteristic of being (1) young, (2) Albanian, (3) women, (4) living alone. For this reason we disagree with the Sixth Circuit’s conclusion in Rreshpja v. Gonzales, that the social group of “young (or those who appear to be young), attractive Albanian women who are forced into prostitution” does not constitute a social group because it is circularly defined by the fact that it suffers persecution. Id. 420 F.3d 551, 555-56 (6th Cir.2005).[5]
Our conclusion is consistent with a parallel line of reasoning found in mixed motive cases. The Board of Immigration Appeals and this Court have long recognized that persecution can exist in a mixed motive case in which the persecutor targets an individual for more than one reason and one of the reasons does not warrant protection under the Act. Under the mixed-motives doctrine, an applicant may qualify for asylum so long as the applicant demonstrates by either direct or circumstantial evidence that his persecutors were motivated, at least in part, by one of the enumerated grounds. Mustafa v. Holder, 707 F.3d 743, 751 (7th Cir.2013).[6] See also Bueso-Avila v. Holder, 663 F.3d 934, 937 (7th Cir.2011) (“[A]n individual may qualify for asylum if his or *673 her persecutors have more than one motive as long as one of the motives is specified in the Immigration and Nationality Act.”).
Suppose, for example, that Muslims in a particular country are wildly disfavored and frequently persecuted by the government. Wealthy Muslims, -however, are tolerated because of their vast contribution to the poor country’s business, tax base and overall wealth. The government, on the other hand, routinely beats, jails and strips of rights poor Muslims. Although the United States does not grant asylum based on poverty, the fact that the persecuted group shares this common characteristic does not disqualify the group from seeking asylum based on religious persecution. We cannot tease out one component of a group’s characteristics to defeat the definition of social group. Escobar, 657 F.3d at 547.
Both dissents submit that Cece is not in the group of young Albanian women living alone because her own expert defined “young” as 16 to 26 or 27, and Cece is now 34. He testified, however, that “this is just a targeted age group. There are many examples of people outside of the targeted age group being kidnapped and trafficked.” (R. 255). In this ease, the Petitioner is part of a group of young Albanian women who live alone. 'Neither their age, gender, nationality, or living situation are alterable. These characteristics qualify Cece’s proposed group as a protectable social group under asylum law.
Demonstrating that an asylum applicant belongs to a cognizable social group is only the first step in determining asylum. Recall that an applicant must show not only that she fits within a cognizable social group but also that there is a nexus between the persecution and the membership in the social group. Escobar, 657 F.3d at 542; Ishitiaq, 578 F.3d at 715. Justice Alito, while on the Third Circuit, described the steps as follows:
The alien must (1) identify a group that constitutes a ‘particular social group’ within the interpretation just discussed, (2) establish that he or she is a member of that group, and (3) show that he or she would be persecuted or has a well-founded fear of persecution based on that membership.
Fatin v. INS, 12 F.3d 1233, 1240 (3d Cir.1993). He then went on to note that, “to the extent that the petitioner in this case suggests that she would be persecuted or has á well-founded fear that she would be persecuted in Iran simply because she is a woman, she has satisfied the first of the three elements that we have noted.” Id. As we are about to see, it is the nexus requirement where the rubber meets the road.
Those who fear that the slope leading to asylum has been made too slick by broad categories need not worry. The importance of the “on account of’ language must not be overlooked. It is this requirement that should assuage Judge Easterbrook’s fears that “[t]his makes eligible for asylum everyone who faces a substantial risk of harm in his native land, no matter the reason.” Post at 680. Although the category of protected persons may be large, the number of those who can demonstrate the required nexus likely is not. As the Board explained of clan-based persecution in Somalia, “the fact that almost all Somalis can claim clan membership and that interclan conflict is prevalent should not create undue concern that virtually all Somalis would qualify for refugee status, as an applicant must establish he is being persecuted on account of that membership.” In re H-, 21 I. & N. Dec. 337, 343 (BIA 1996). The breadth of the social group says nothing about the requirements for asylum, just as the breadth of catego *674 ríes under Title VII of the Civil Rights Act says nothing about who is eligible to sue an employer for discrimination. All African Americans and all women, for example, are members of “protected” categories under Title VII, but not all African Americans and women have a claim for discrimination. In order to be entitled to asylum, Cece must be able to demonstrate a particular link between her mistreatment and her membership in the stated social group. Escobar, 657 F.3d at 544; Bueso-Avila, 663 F.3d at 936. This requirement is not unique to inquiries about persecution based on “social group,” but rather one that is applicable to cases of claimed persecution based on race, religion, nationality or political opinion. In other words, an ethnic Rom (gypsy) who has been mistreated by the town mayor because of a long-standing business dispute would not be eligible for asylum even if the mayor has undoubtedly and unfairly mistreated him, and even if he belongs to an ethnic group that was frequently the target of persecution in his country. The persecution must still be “on account of’ the protected category.
In any event, the breadth of category has never been a per se bar to protected status. As we noted in Iao v. Gonzales,
The number of followers of Falun Gong in China is estimated to be in the tens of millions, all of them subject to persecution .... [Because] [a]nyone, we suppose, can get hold of a book of [Falun Gong] teachings, start doing the exercises, and truthfully declare himself or herself a bona fide adherent to Falun Gong[,] [t]he implications for potential Chinese immigration to the United States may be significant.... But Congress has not authorized the immigration services to [control Chinese immigration] by denying asylum applications in unreasoned decisions.
Iao v. Gonzales, 400 F.3d 530, 533 (7th Cir.2005). Many of the groups recognized by the Board and courts are indeed quite broad. These include: women in tribes that practice female genital mutilation; Matter of Kasinga, 21 I. & N. Dec. at 365, Agbor, 487 F.3d at 502; persons who are opposed to involuntary sterilization, 8 U.S.C. § 1101(a)(42)(B); Chen v. Holder, 604 F.3d 324, 332 (7th Cir.2010); members of the Darood clan and Marehan subclan in Somalia, In re H-, 21 I. & N. Dec. at 340, 343 (1% of the population of Somalia are members of the Marehan subclan); homosexuals in Cuba, In re Toboso-Alfonso, 20 I. & N. Dec. 819, 822-23 (BIA 1990); Filipinos of Chinese ancestry living in the Philippines, Matter of V-T-S-, 21 I. & N. Dec. 792, 798 (BIA 1997) (approximately 1.5% of the Philippines population has an identifiable Chinese background); Singh v. INS, 94 F.3d 1353, 1359 (9th Cir.1996) (rejecting the notion that an applicant is ineligible for asylum merely because all members of a persecuted group might be eligible for asylum). The ethnic Tutsis of Rawanda numbered close to 700,000 before the genocide of 1994, and yet a Tutsi singled out for murder who managed to escape to the United States could surely qualify for asylum in this country. And undoubtedly any of the six million Jews ultimately killed in concentration camps in Nazi-controlled Europe could have made valid claims for asylum, if only they had had that opportunity.[7] Many of our asy *675 lum laws originated out of a need to address just such refugees from World War II. It would be antithetical to asylum law to deny refuge to a group of persecuted individuals who have valid claims merely because too many have valid claims. See Iao, 400 F.3d at 533; Singh, 94 F.3d at 1359. For this reason we also reject the Sixth Circuit’s reasoning that the group of young-looking, attractive Albanian women who are forced into prostitution is not a cognizable social group because it is too broad and sweeping of a classification. Rreshpja, 420 F.3d at 555.
The safeguard against potentially innumerable asylum claims is found in the stringent statutory requirements for all asylum seekers which require that the applicant prove (1) that she has suffered or has a well-founded fear of suffering harm that rises to the level of persecution, (2) on account of race, religion, nationality, membership in a particular social group, or political opinion, and (3) is unable or unwilling to return to her country because of the persecution or a well-founded fear of persecution. 8 U.S.C. § H01(a)(42)(A), 1158(b)(1); Bejko v. Gonzales, 468 F.3d 482, 484 (7th Cir.2006).
Judge Easterbrook’s dissent argues that “[w]hatever risk Cece faces comes from criminals, not from the government.” Post at 679. Of course “persecution does not include the actions of private citizens unless the government is complicit in those acts or is unable or unwilling to take steps to prevent them.” Bitsin v. Holder, 719 F.3d 619, 628 (7th Cir.2013). In his initial determination, the immigration judge found that Albania was unable or unwilling to protect Cece from third party traffickers, (R. 129, 131). In its decision overturning the immigration judge, the Board said only that “there is no indication that the government of Albania was involved in the incident described by the applicant, nor that such government is interested in harming the applicant. (R. 330). The first proposition is simply wrong. Cece complained to the police, but they refused to take any action. More importantly, the standard is not just whether the government of Albania was involved in the incident or interested in harming Cece, but also whether it was unable or unwilling to take steps to prevent the harm. Bitsin v. Holder, 719 F.3d at 628-29. On remand, the immigration judge acknowledged his obligation to follow the Board’s determination regarding the proposed social group, but still noted his finding that Cece could not depend upon the police to protect her from traffickers. (R. 115-116). The Board had nothing further to say about the matter. When the Board agrees with the decision of the immigration judge, adopts that decision and supplements that decision with its own reasoning, as it did here, we review the immigration judge’s decision as supplemented by the Board. Mustafa v. Holder, 707 F.3d 743, 750 (7th Cir.2013) (citing Jonaitiene v. Holder, 660 F.3d 267, 270 (7th Cir.2011)); Barma, 640 F.3d at 751. In this case the Board based its denial of asylum on the fact that first, Cece did not belong to a cognizable social group and second, she would have been able to relocate safely within Albania. The Board therefore had no need to address the immigration judge’s factual finding that the police were unable or unwilling to prevent the harm. Judge Easterbrook opines that the Board must be at liberty to consider this subject on remand. Whether or not the Board could consider (or reconsider) this matter on remand, however, this court is certainly entitled to (and indeed obligated to) review the decision of the immigration judge as supplemented by the BIA’s reasoning. Jonaitiene, 660 F.3d at 270. We review agency findings of fact for “substantial evidence” and may reverse *676 the Immigration Judge’s determinations “only if we determine that the evidence compels a different result.” FH-T v. Holder, No. 12-2471, 723 F.3d 833, 838, 2013 WL 3800252, * 3 (7th Cir. July 23, 2013). Judge Easterbrook’s conclusion that Cece faced no “mistreatment at public hands” is contrary to the only factual finding on the matter. In any event, the entirety of the discussion is unnecessary, as the Board based its decision on the fact that Cece’s proposed social group was not cognizable under the act — a holding with which we disagree.
Circling back to our level of deference, now with a clear understanding of the Board’s definition of social group derived from Acosta, we must uphold the Board’s determination if it is “a reasonable construction of the statute, whether or not it is the only possible interpretation or even the one a court might think best.” Holder v. Martinez-Gutierrez, — U.S.-, 132 S.Ct. 2011, 2017, 182 L.Ed.2d 922 (2012) (citing Chevron U.S.A. Inc. v. Natural Resources Def. Council, Inc., 467 U.S. 837, 843-844, and n. 11, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)); INS v. Orlando Ventura, 537 U.S. 12, 16, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002). The problem here is that the Board’s decision is inconsistent with its decisions in other similar cases. Cece’s social group is not different than many of the groups approved by the BIA. For example, she is not unlike the women in Kasinga, supra, 21 I. & N. Dec. at 365-66 who were young women in a tribe that practices female genital mutilation. In both cases the broad immutable group that triggered social group status — young women in particular tribes in Kasinga’s case, and young women in Albania, in Cece’s case — could be narrowed by other changeable but fundamental characteristics — living alone in Cece’s case, and having not yet been subjected to female genital mutilation in Kasinga’s case. Nor is Cece unlike the Jordanian women who face “honor killings” because of the social and religious norms in Jordan, Sarhan, 658 F.3d at 654, or Christian women in Iran who do not wish to adhere to the Islamic female dress code. Yadegar-Sargis, 297 F.3d at 603.
In other words the social group is defined by gender plus one or more narrowing characteristics. Although some courts have toyed with the idea that gender alone can form the basis of a social group, we need not decide that today. See, e.g., Perdomo v. Holder, 611 F.3d 662, 667 (9th Cir.2010) (“Thus, we clearly acknowledged that women in a particular country, regardless of ethnicity or clan membership, could form a particular social group”); Hassan v. Gonzales, 484 F.3d 513, 518 (8th Cir.2007) (“Somali females” constitute a particular social group); Fatin v. INS, 12 F.3d 1233, 1240 (3d Cir.1993) (Iranian women meet the social group definition). See also In re A-T-, 24 I. & N. Dec. 296, 304 (“gender is an immutable trait that is generally recognizable”), vacated and remanded, Matter of A-T-, 24 I. & N. Dec. 617, Interim Decision 3622, 2008 WL 4306933 (BIA Sept. 22, 2008). Although nonbinding, the agency’s own “Gender Guidelines,” which provide Asylum Officers with guidance on adjudicating women’s claims of asylum, provide a helpful understanding by noting that gender is an immutable trait that can qualify under the rubric of “particular social group.” United States Bureau of Citizenship and Immigration Services, Considerations for Asylum Officers Adjudicating Asylum Claims from Women (“INS Gender Guidelines ”), 26 May 1995, available at: http://www. unhcr.org/refworld/docid/3ae6b31e7.html [accessed July 25, 2013]. And the Office of the United Nations High Commissioner for Refugees (again, not authoritative, but informative) has made clear that “women may constitute a particular social group *677 under certain circumstances based on the common characteristic of sex, whether or not they associate with one another based on that shared characteristic.” UNHCR, Guidelines on International Protection: Member-ship of a Particular Social Group, at 4 (HCR/GIP/02/02, 7 May 2002).
Because Cece’s group cannot be distinguished from others with immutable and fundamental traits, the Board’s decision is inconsistent with its own precedent.
When an administrative agency’s decisions are inconsistent, a court cannot pick one of the inconsistent lines and defer to that one, unless only one is within the scope of the agency’s discretion to interpret the statutes it enforces or to make policy as Congress’s delegate .... Such picking and choosing would condone arbitrariness and usurp the agency’s responsibilities.
Gatim% 578 F.3d at 616 (internal citations omitted). In this case, the Board has offered no explanation for why Cece’s group is not cognizable under the test the Board has adopted in Acosta. Sepulveda v. Gonzales, 464 F.3d 770, 772 (7th Cir.2006). Or, more specifically, why being a young woman living alone in Albania does not qualify as a social group when the attributes are immutable or fundamental. The issue of whether a particular social group is cognizable is a question of law on which the Board erred. Escobar, 657 F.3d at 542. See also, Ayala, 640 F.3d at 1096-97; Castaneda-Castillo, 638 F.3d at 363; Crespin-Valladares, 632 F.3d at 124; GomezZuluaga, 527 F.3d at 339; Malonga, 546 F.3d at 553; Castillo-Arias, 446 F.3d at 1195; Cruz-Funez, 406 F.3d at 1191. The Board’s decision cannot stand and must be reconsidered on remand: Cece has established that she belongs to a cognizable social group.
We are well aware of the limits of our review set forth in Gonzales v. Thomas, 547 U.S. 183, 185-86, 126 S.Ct. 1613, 164 L.Ed.2d 358 (2006) (per curium) and INS v. Orlando Ventura, 537 U.S. 12, 16-17, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) (per curium). An appellate court errs by deciding in the first instance, without giving the Board the first opportunity on remand, whether a proposed social group is cognizable within the meaning of the Act. Id. The judge and Board had before them all of the facts pertaining to Cece’s proposed social group and yet determined that her social group was not cognizable under the Act. This was error in light of the Board’s own precedent in Acosta.
III.
The Board also found that there was insufficient evidence in the record that internal relocation was not a feasible means of avoiding the persecution of which Cece complains. The Board, however, ignored the fact, emphasized throughout the hearing and appeals, that Cece had lived safely in Tirana only while living with her sister in her sister’s university dormitory. Once her sister left Tirana and Cece had to move from the dormitory, she was again at risk. (R. 168-172). The Albanian expert testified at length that Albania was a small country and that it would be difficult to hide anywhere. (R. 231). Even in the big city of Tirana, people tended to live in family or clan groupings, and a young single woman living alone would stick out as an anomaly. Id. The expert also surmised that Cece faced an increased risk of being targeted simply because of her previous status as a target, i.e. she was already known to traffickers. (R. 229, 230, 257). The immigration judge acknowledged the expert’s testimony on these facts and was troubled by the Board’s conclusion that Cece could move safely within Albania notwithstanding the facts that “she is a young woman from a minority religion who has *678 lived by herself most of the time in Albania, and thus is vulnerable, particularly vulnerable to traffickers for those reasons.” (R. 120). The immigration judge then concluded, “I do not agree with the Board’s conclusion, but I am required to follow it.” Id. The Board, in its order, had but this to say about her ability to relocate: “we once again find that there is insufficient evidence in the record that internal relocation is not reasonable.”[8] (R. 9). The Board’s decision lacked any discussion or analysis of the issue. Thus the only evidence-based analysis we have is that of the immigration judge whose conclusion is that Cece could not safely relocate within Tirana. Nevertheless the Board held that she could. The Board’s conclusion is not supported by substantial evidence. Vahora v. Holder, 626 F.3d 907, 912-913 (7th Cir.2010) (“Under the substantial evidence standard, the agency’s determination will stand if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole.”). Indeed it is not supported by evidence of any kind whatsoever. The only evidence in the record is that Cece felt safe in Tirana only so long as she was not living alone — a status quo that ended as soon as her last family member left the country. An asylum applicant is entitled to a reasoned analysis of her case supported by relevant, probative evidence. Mustafa, 707 F.3d at 754. A failure to provide such a reasoned analysis requires remand. Kadia v. Holder, 557 F.3d 464, 467 (7th Cir.2009).
We therefore grant the petition for review and remand to the agency for further proceedings consistent with this opinion.

. The Board appropriately abandoned its criticism that Cece had failed to demonstrate "social visibility.” Between the time of the first and second Board appeals, this Court rejected a social visibility analysis and concluded that applicants need not show that they would be recognized as members of a social group to qualify for withholding. See Gatimi v. Holder, 578 F.3d 611, 614-15 (7th Cir.2009) (noting that homosexuals might well pass as heterosexual, and women who have not yet undergone genital mutilation look no different than other women).

. Both Al-Ghorbani and Safaie, supra, have been superseded on other grounds by statute, 8 U.S.C. § 1252(b)(3)(B), as recognized in Rife v. Ashcroft, 374 F.3d 606, 614-15 (8th Cir.2004).

. Occasionally the adjudicators or parties refer to Cece as "single,” which appears, in this context, to be shorthand for living alone, see Opening Brief of Appellants before the three-judge panel of this Court, at 20, 22, 27, 28 (contending that Cece is member of a group of "young, single, women in Albania.”)

. The immigration judge's decision on remand is the only one which we review, as the former has been vacated. We refer to the earlier decision only to determine how Cece's social group has been articulated throughout the litigation. Our review then is of the immigration judge's second opinion of December 1, 2008, as supplemented by the Board’s opinion of March 31, 2011 dismissing her appeal. See Barma v. Holder, 640 F.3d 749, 751 (7th Cir.2011) ("Where, as here, the BIA agrees with the IJ’s decision but supplements that decision with its own explanation for rejecting the appeal, we review the IJ's decision as supplemented by the BIA’s reasoning.”).

. The Second Circuit has also addressed a similar issue in Gjura v. Holder, 502 Fed. Appx. 91 (2d Cir.2012), but in that case the court skirted the issue of whether "young, unmarried Albanian women could constitute a social group” and found instead that the applicant, Gjura, had failed to establish a nexus. Id.

. The REAL ID Act of 2005 now requires an applicant to show that one of the five protected grounds was at least one "central reason” for his persecution. See 8 - U.S.C. § 1158(b)(l)(B)(i). Cece filed her asylum claim in 2002, thus pre-REAL ID standards and case law apply. See Dawoud v. Gonzales, 424 F.3d 608, 613 (7th Cir.2005). In any event, the "central reason" for her persecution is that she was a young woman living alone, and as such she would qualify even under the Real ID Act as the ground need only be "central.” A ground may be a secondary (or tertiary, etc.) reason and still justify asylum provided the applicant can show that the protected status played more than a minor role in motivating a persecutor. Shaikh v. Holder, 702 F.3d 897, 902 (7th Cir.2012).

. Although some Jews might have had the opportunity to seek asylum in the United States, having escaped Germany on the M.S. St. Louis, they were ultimately denied entry into the United States. The ship was forced to return to Europe where 254 of the 937 refugees seeking asylum from the Nazis were eventually killed in concentration camps. S.Res. Ill, 111th Cong. (2009).

. In its first order, before remand, the Board simply stated that “the applicant appears to have successfully relocated within Albania. There is insufficient evidence in the record that she has a well-founded fear of persecution in Tirane or in another city within Albania, outside of Korgé ... there is no indication that Reqi (or any other trafficker) tried or was motivated to pursue the applicant outside of Korgé.” (R. 331).