In the

# United States Court of Appeals

## For the Seventh Circuit

---

Nos. 15-2212, 15-2929 & 15-3615

RUSLANA MELNIK, also known as
RUSLANA GNATYUK, et al.,

*Petitioners*,

*v.*

JEFFERSON B. SESSIONS III, Attorney
General of the United States,

*Respondent*.

---

Petitions for Review of Orders of the
Board of Immigration Appeals
Nos. A906-207-913 & A099-197-430

---

ARGUED FEBRUARY 6, 2018 — DECIDED MAY 25, 2018

---

Before RIPPLE, SYKES, and BARRETT, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Ruslana Melnik and Mykhaylo Gnatyuk, a married couple who are citizens of Ukraine, petition for review of decisions of the Board of Immigration Appeals ("Board"). The Board dismissed their appeal from the decision of an immigration judge, denying their applications for asylum and ordering their removal from the United States.

The Board also denied their subsequent motions to reconsider the dismissal and to reopen proceedings, as well as their motions to reconsider those denials.[1] We have consolidated their timely petitions for review. For the reasons set forth in this opinion, we deny the petitions.

# I

## BACKGROUND

### A.

Mr. Gnatyuk entered the United States on a visitor's visa in 2003 and overstayed. Ms. Melnik joined him a year later, but immigration authorities apprehended her on entry because they determined that she had presented a fraudulent passport. After she requested asylum and passed a credible fear interview, authorities referred her case to the Asylum Office of United States Citizenship and Immigration Services. The Government later denied her affirmative application for asylum and placed her in removal proceedings. A delay of nearly a decade ensued. Mr. Gnatyuk also filed his own affirmative application for asylum in 2010, but the Government denied this application as well, placed Mr. Gnatyuk in removal proceedings, and consolidated the two cases.

The record reveals that, for the six years preceding their travel to the United States, Ms. Melnik and Mr. Gnatyuk operated a clothing business in Ukraine. In the course of their

---

[1] The Board's jurisdiction was predicated on 8 C.F.R. §§ 1003.1(d), 1003.2. Our jurisdiction is predicated on 8 U.S.C. § 1252(a)(5).

work, they traveled to Poland and Hungary to purchase clothing. They then resold this merchandise in a market in their hometown in Western Ukraine. Ms. Melnik testified that, during that period, men, whom she described as "racketeers," victimized them through extortion.[2] She claimed that, in an effort to force them to hand over money, these individuals beat Mr. Gnatyuk on multiple occasions and once set his car on fire. She further testified that they went to the local police but that the authorities did nothing. She also stated that they closed their business and decided to live separately to ensure her safety and the safety of her daughter, who continues to live in Ukraine.

Ms. Melnik said that she feared returning to Ukraine because she now lives in the west and "the racketeers and everybody, they don't like western people."[3] Addressing the situation in Ukraine after her departure, Ms. Melnik told the immigration judge that her husband's brother-in-law had been a recent victim of extortion and beating, although she did not know who was responsible. She described her hometown as "destroyed" and identified photos of "burning places" in her village, but she could not say what had happened or why.[4] She also stated that she owed money for the false Ukrainian passport that she had used to travel to the United States. She claimed that her family had faced "constant threats" after her

---

[2] A.R. at 219. Citations to the Administrative Record refer to the record in case number 15-3615.

[3] *Id.* at 223.

[4] *Id.*

departure.[5] She later stated, however, that individuals demanded money from her mother once in 2004, but there had been no repetition of the incident in later years. She explained this isolated incident by noting that her mother lives "in the village" and that the racketeers live in the town.[6] She therefore does not experience routine harassment because the racketeers "don't go [to] the village."[7]

Mr. Gnatyuk also testified. He said that the racketeers demanded a "tax" every month,[8] and that he had suffered multiple injuries over time, including a broken finger and stitches on his head because of his unwillingness to comply.[9] He claimed that when he had complained to the police, they arrested him along with the racketeers and placed them in the same cell. He also claimed that there were few economic opportunities in Ukraine and that he had come to the United States to live in a country "that takes care of its residents" and has police that will "come up and help you if you're in trouble."[10] In reply to a question about the recent extortion of his brother-in-law, Mr. Gnatyuk said that he believed the men who had extorted him "now … all have government badges."[11] Finally, he spoke about his life in the United States.

---

[5] *Id.* at 228.

[6] *Id.* at 230.

[7] *Id.*

[8] *Id.* at 236. Ms. Melnik's statement indicated that it was roughly $250 a month. *Id.* at 338.

[9] *Id.*

[10] *Id.* at 237.

[11] *Id.* at 238.

He described a business he had built, comprising fifteen trucks and drivers. He estimated its value as one million dollars.

The petitioners also called a friend who is a Ukrainian priest, Fr. Kalynyuk. He stated that before Mr. Gnatyuk came to the United States, he had lived with Fr. Kalynyuk's brother for safety and that the police were unable to protect him. He believed Mr. Gnatyuk would be killed if he returned.

## B.

Both petitioners requested asylum before the immigration judge. The immigration judge first determined that Mr. Gnatyuk's application in 2010 was untimely and that, he had not established changed circumstances to justify his late filing. The immigration judge therefore ruled that although he would consider only Mr. Gnatyuk's application for withholding of removal, he would consider him a derivative applicant on his wife's application for asylum.

Reaching the merits of the petitioners' claims, the immigration judge recognized that they have a "generalized fear of returning to the Ukraine because of the present country conditions," which he described as an "upheaval."[12] He further acknowledged that, at the time of his decision, the Department of Homeland Security was not deporting to Ukraine even those with final orders of removal. This action, he further noted, was an exercise of discretion on the part of the Department and was not a matter within his purview.

---

[12] *Id.* at 108.

After an examination of our case law, the immigration judge determined that the petitioners' proffered social group of "business owners in the Ukraine who have been extorted by criminal elements and not protected by the government"[13] was not cognizable under the Immigration and Nationality Act. He explained that characterizing the group in this manner amounted to defining it primarily by the harm suffered in the past, which was "circular."[14] When the prior harm was removed from the definition, the proffered social group became all small business owners, a group that was, in the immigration judge's view, "too broad."[15] The judge could find, moreover, no motivation for the group's victimization other than profit.

The judge also expressed skepticism about the petitioners' documentary evidence. The material lacked a substantial update since the original filings in 2004 and 2010. He also questioned the credibility of Mr. Gnatyuk's claim that the police had arrested him when he complained about the extortion. In the judge's view, evidence of the beating of Mr. Gnatyuk's brother-in-law by criminal elements in Ukraine did not establish that the present government would not protect the petitioners if they returned.

Finally, the immigration judge remarked that the couple had resided in the United States for more than ten years "largely due to the ineffectiveness of the Department of

---

[13] *Id.* at 109.

[14] *Id.* at 110.

[15] *Id.*

Homeland Security and the Immigration courts."[16] The judge estimated that an appeal to the Board might take years and informed the petitioners that, if country conditions in Ukraine change or there are materially changed circumstances, they may request a further hearing.

The immigration judge denied Ms. Melnik's request for asylum and Mr. Gnatyuk's application for withholding of removal. Because neither petitioner argued that the Ukrainian government would harm them upon their return, they could obtain no relief under the Convention Against Torture.

## C.

The Board dismissed the petitioners' appeal. It first agreed with the immigration judge's determination that Mr. Gnatyuk's petition for asylum was untimely and added that his assertion of worsened conditions did not constitute "changed or extraordinary circumstances" that would excuse untimely filing. In the Board's view, the changes described by Mr. Gnatyuk did not affect materially "either his eligibility for relief or ability to … file [an] application based upon his fear of harm from racketeers that originally caused him to flee to the United States."[17]

The Board then turned to the merits of the appeal. It agreed with the immigration judge that the petitioners had not established the requisite past persecution or well-founded

---

[16] *Id.* at 111.

[17] *Id.* at 90.

fear of future persecution necessary for relief under the statute. The Board agreed with the immigration judge's conclusion that the proffered group was defined primarily "by its members' shared experience of past persecution."[18] Even if the proffered social group were cognizable under the statute, continued the Board, the petitioners had not demonstrated that their membership in that group was, or would be, a central reason for their persecution. The petitioners had not shown that the threats and demands for money that they experienced "were made for any purpose other than enriching the extortionists."[19] The Board also denied withholding because the petitioners had failed to meet even the lower burden applicable to asylum.

The petitioners moved to reopen and to reconsider the Board's decision. The Board denied reconsideration because the petitioners had not identified an error of fact or law in the prior decision. It denied reopening because the petitioners did not establish that the new evidence would likely change the result in the case. The petitioners had submitted a death certificate of Mr. Gnatyuk's business partner who had remained in Ukraine. Noting that the document provided no details about the circumstances surrounding the death, the Board concluded that the document "does not sufficiently demonstrate that there exists a reasonable possibility that the [petitioners] would be targeted for harm rising to the level of persecution on account of their membership in a particular social

---

[18] *Id.* at 91.

[19] *Id.*

group or other protected ground."[20] The petitioners filed a
timely petition for review.

The petitioners also sought reconsideration of the Board's
ruling on their motions. Again, the Board concluded that they
had not identified an error of fact or law. Mr. Gnatyuk and
Ms. Melnik filed a timely petition for review from this deci-
sion.

## II

## DISCUSSION

### A.

Mr. Gnatyuk first asks that we review the immigration
judge's determination, approved by the Board on its review,
to pretermit his request for asylum because it was untimely.
We have no jurisdiction to review this question. Section
1158(a)(2)(B) of Title 8, United States Code, requires asylum
applicants to demonstrate by clear and convincing evidence
that their asylum applications are filed within one year of
their arrival in the United States. Subsection (2)(D) allows for
certain limited exceptions where the "alien demonstrates to
the satisfaction of the Attorney General either the existence of
changed circumstances which materially affect the appli-
cant's eligibility for asylum or extraordinary circumstances
relating to the delay in filing an application."   8 U.S.C.
§ 1158(a)(2)(D). However, § 1158(a)(3) specifically provides
that "[n]o court shall have jurisdiction to review any determi-

---

[20] *Id.* at 29.

nation of the Attorney General under paragraph 2." We retain, of course, limited jurisdiction to review constitutional claims and questions of law. *See Bitsin v. Holder*, 719 F.3d 619, 625 (7th Cir. 2013) (citing 8 U.S.C. § 1252(a)(2)(D)).

Mr. Gnatyuk's attempts to obtain relief despite this jurisdictional bar are without merit. He first submits that his remarriage to his wife in 2012 "brings him within the one year filing requirement of his wife."[21] This assertion is correct only in the sense that his marriage permits him to assert derivative eligibility on his wife's asylum application. Both the immigration judge and the Board acknowledged this derivative right and adjudicated the case on this premise. This derivative right has no effect, however, on the timeliness of his *own* application.

Mr. Gnatyuk also contends that his asylum application was timely based on a change in circumstances. He first contends that the relevant regulation, which interprets the statute to allow delayed filings only when they occur within a "reasonable period" of a change in circumstances, is ultra vires and overly restrictive. *See* 8 C.F.R. § 1208.4(a)(4)(ii). He also contends that even if the regulation is valid, he filed within a "reasonable period." His arguments are not responsive, however, to the position of the agency. It did not fault Mr. Gnatyuk for taking too much time to proffer evidence of changed circumstances upon which he relied, specifically the conflict between Russia and Ukraine and the unexplained death of Mr. Gnatyuk's relative. It merely concluded that these changes were not material to his claim that he was a target for extortion by criminal elements. It determined that he had

---

[21] Pet'rs' Br. 34.

failed to identify *material* changed circumstances affecting his eligibility. This fact-based determination is precisely the sort of finding removed from our review by 8 U.S.C. § 1158(a)(3). *See, e.g.*, *Minghai Tian v. Holder*, 745 F.3d 822, 826 (7th Cir. 2014) ("Tian does not ask us to adjudicate constitutional claims or questions of law relating to the timeliness of his asylum application. Instead, he asks us to review the Board's factual determination that there existed no changed or extraordinary circumstances to excuse his late filing.").

### B.

We now turn to the petitioners' substantive claims for relief. As the case comes to us, Ms. Melnik seeks review of the Board's denial of both her asylum and withholding of removal claims. Because we have no jurisdiction to review the Board's decision that his asylum claim is untimely, Mr. Gnatyuk only can seek review of the Board's denial of his withholding of removal claim. The petitioners rely on the same arguments and the same evidence with respect to both claims.

To be eligible for asylum, a petitioner must demonstrate that she is a refugee within the meaning of the Immigration and Nationality Act, 8 U.S.C. § 1158(b)(1)(A). That statute defines a refugee as an alien "who is unable or unwilling to return to" the country of his nationality because of "a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42); *see also id.* § 1158(b)(1)(B)(i).

Ms. Melnik rests her asylum claim on membership in a particular social group. To qualify for asylum on this basis, an

alien must: (1) identify the particular social group; (2) establish that she is a member of that group; and (3) establish that the persecution or her well-founded fear of persecution is based on her membership in that group. *Escobar v. Holder*, 657 F.3d 537, 545 (7th Cir. 2011).

"Whether a group constitutes a particular social group under the Immigration and Nationality Act is a question of law that we review *de novo*, while giving *Chevron* deference to the Board's reasonable interpretation set forth in precedential opinions interpreting the statute." *Cece v. Holder*, 733 F.3d 662, 668 (7th Cir. 2013) (en banc). The statute does not contain a specific definition of a "social group." "[T]he Board has described it as a group whose members share 'common characteristics that members of the group either cannot change, or should not be required to change because such characteristics are fundamental to their individual identities,'" *Escobar*, 657 F.3d at 545 (quoting *Gatimi v. Holder*, 578 F.3d 511, 514 (7th Cir. 2009)), and that definition is entitled to deference, *Cece*, 733 F.3d at 669; *see also Gonzales v. Thomas*, 547 U.S. 183 (2006) (per curiam).[22]

---

[22] Crafting a workable and comprehensive definition of "social group" has been an understandably difficult task for the Board. Its initial approach, outlined in *Matter of Acosta*, 19 I. & N. Dec. 211, 232–33 (BIA 1985), acknowledged "the ambiguity and the potential breadth of the phrase 'particular social group.'" *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 231 (BIA 2014). Consequently, the Board "favored a case-by-case determination of the particular kind of group characteristics that would qualify under the Act." *Id.* However, this "flexible approach" to addressing "the ambiguity and the potential breadth of the phrase" has "led to confusion and a lack of consistency." *Id.* The Board has made efforts to clarify further the standard. *See id.* at 231–33. Many circuits deferred to the Board's addition of

Before the Board, the petitioners proffered their social group as that of business owners targeted for extortion and not protected by the government. The Board also considered their contention that their additional wealth and westernization upon returning from the United States would make them targets upon their return. The Board held that these groups were not cognizable under the statute because the defining characteristic was primarily the fact of its members' prior persecution.[23] We, like the Board, have held consistently that where a group shares no common characteristic other than the fact that its members have been persecuted, it does not qualify as a social group. *See Escobar*, 657 F.3d at 545 (citing multiple prior circuit cases and *In re C‑A‑*, 23 I. & N. Dec. 951, 956 (BIA 2006)). Indeed, the Board has drawn support from the Guidelines of the United Nations High Commissioner for Refugees, which stated that members

these requirements. We, along with our colleagues in the Third Circuit, rejected portions of the Board's further requirements. *See Cece v. Holder*, 733 F.3d 662, 668–69, 668 n.1 (7th Cir. 2013) (en banc); *Valdiviezo-Galdamez v. Att'y Gen.*, 663 F.3d 582 (3d Cir. 2011) (rejecting the Board's "particularity" and "social visibility" requirements). These decisions prompted additional efforts at clarification from the Board. *See Matter of M-E-V-G-*, 26 I. & N. Dec. at 229; *Matter of W-G-R-*, 26 I. & N. Dec. 208 (BIA 2014), *aff'd in part, vacated in part sub nom. Reyes v. Lynch*, 842 F.3d 1125 (9th Cir. 2016). We have not had the occasion to consider the Board's most recent efforts in this regard, and we need not do so today. The Board relied on neither the "social visibility" nor the "particularity" requirement in its disposition of this case, and the petitioners have not addressed these requirements.

[23] In their brief to this court, the petitioners suggest more than a page of additional formulations of a social group they believe satisfies the statute. *See* Pet'rs' Br. 29–30. Those groups that the petitioners did not present to the agency are not properly exhausted, and we will not consider them. *See Arobelidze v. Holder*, 653 F.3d 513, 516–17 (7th Cir. 2011).

of a social group "share a common characteristic *other than their risk of being persecuted.*" *See In re C-A-*, 23 I. & N. Dec. at 956 (quoting U.N. Doc. HCR/GIP/02/02 (May 7, 2002) ("UNHCR Guidelines")). Applying these principles, we already have rejected claims where the primary factor that unites the victims of persecution is wealth or perceived wealth. *See Orellana-Arias v. Sessions*, 865 F.3d 476, 485–86 (7th Cir. 2017) (citing numerous cases from this circuit and others). Our cases have required consistently a shared characteristic *other than* the convenience or opportunity of targeting someone with an ability to pay. *See, e.g.*, *Tapiero de Orejuela v. Gonzales*, 423 F.3d 666, 672 (7th Cir. 2015) (rejecting the IJ's characterization of the petitioner's social group as based on wealth alone and accepting the class of "the educated, landowning class of cattle farmers" targeted by the FARC).

Here, other than prior victimization for extortion, the only common characteristic of members of the proffered class is their status as small business owners. The petitioners presented no objective evidence that small business owners are of any particular interest to the extortionists. They are simply a convenient target of a criminal element looking for a source of income. On this point, our decision in *Escobar*, 657 F.3d 537, is instructive. There, a Colombian national, who owned a trucking business and who was associated actively with the Liberal Party in that country, had his trucks commandeered by the revolutionary group known as FARC. Under threat of death, this organization forced Escobar, on several occasions, to carry its shipments in his trucks. An opposing group, suspecting that he was collaborating with FARC, also made a threat to kill him. He went into hiding, but FARC came looking for him and burned his trucks. Caught between these competing death threats, Escobar fled Colombia and traveled

to the United States where he sought asylum. The Board denied relief. In its view, FARC's burning of the trucks was simply a nonphysical economic injury of insufficient severity to warrant characterization as persecution.

We granted Escobar's petition and reversed the decision of the Board. We took issue with the Board's characterization of Escobar's experience as simply an encounter with a criminal element that wanted his trucks. Such a "sanitized" perspective, we held, did not take into account the entirety of the situation. *Id.* at 544. Escobar had contended that he was a member of a social group of truck owners who, "because of their anti-FARC views and actions, have collaborated with law enforcement and refused to cooperate with FARC." *Id.* at 545. We ruled that such a group qualified as a "social group" within the meaning of the statute. We rejected the Government's argument that Escobar's characterization failed because an individual can cease to be a truck driver and, therefore, the group did not involve an immutable characteristic. We stressed that the group, as defined by Escobar, involved all truckers who *in the past* had favored the government over FARC, a characteristic that simply was incapable of change. In short, Escobar belonged to a group that possessed an asset that FARC needed and wanted to keep out of enemy hands. That characteristic simply cannot be changed. His combination of skill and his political history *was* immutable, even if his choice of profession was not.

In reaching our decision in *Escobar*, we contrasted the situation there with an earlier unpublished order of this court where we had denied a petition because the proffered group was simply those individuals who had sought police protection from a gang. This group, we noted, had no common link

other than the violence suffered by its members. *Id.* at 545–46 (discussing *Poroj-Mejia v. Holder*, 397 F. App'x 234 (7th Cir. 2010)).

*Escobar* demonstrates the kind of shared characteristics, beyond a history of persecution, that permit recognition as a social group. The petitioners' proffered group, by contrast, simply does not make the requisite showing. Accordingly, the Board's conclusion that the petitioners did not demonstrate membership in a social group cognizable under the statute is consistent with its approach to the definition of social group and equally consistent with our case law.

We also agree with the Board's further conclusion that, even were the proffered group cognizable, the petitioners have not established a nexus between small-business-group membership and their targeting by the criminal group. The petitioners have submitted no evidence that these criminals have any particular animus toward small business owners as small business owners. The small business owners simply have money that the criminals want. As the Board stated, "[a]bsent some demonstration of a causal link, there is no reason to infer that the threats and demands for money experienced by the respondents were made for any purpose other than enriching the extortionists, which would not constitute persecution on account of a protected ground."[24] Substantial evidence therefore supports the Board's determination that the persecution was not "on account of" membership in a particular social group. *See Bathula v. Holder*, 723 F.3d 889, 901–02

---

[24] A.R. at 91.

(7th Cir. 2013) (applying the substantial evidence standard to the question of nexus).[25]

## C.

We next examine whether the Board erred in denying the petitioners' motion to reconsider or their motion to reopen. On a motion to reopen, the Board considers not only whether an alien's proffered changed circumstances or new evidence satisfy the standard for reopening, 8 C.F.R. § 1003.2(c)(1), but also whether the evidence establishes a prima facie claim for the relief sought, *Moosa v. Holder*, 644 F.3d 380, 384–85 (7th Cir. 2011). We review the Board's decision on a motion to reopen for an abuse of discretion. *Id.* at 384.

In support of their motion for reopening, the petitioners submitted a death certificate of Mr. Gnatyuk's former business partner. The certificate does not describe the circumstances of the partner's death. An affidavit submitted by Mr. Gnatyuk merely adds that his partner was "killed";[26] it gives no further explanation. The affidavit also adds that Mr. Gnatyuk opposes recent Russian actions in Ukraine and

---

[25] The petitioners also asserted that they might be targeted as modern, westernized, wealthy returnees. The Board rejected that variation "[f]or the same reasons," *id.* at 91, and we see no error in that conclusion. The petitioners have provided no evidence that it is animus, rather than opportunism, that motivated their targeting by the racketeers. Furthermore, because withholding of removal requires the same showings, *see* 8 U.S.C. § 1231(b)(3), the Board committed no error in denying relief to the petitioners on these applications.

[26] A.R. at 43.

fears that his political views would further subject him to persecution if forced to return. The petitioners submitted *no* objective evidence of the current state of affairs in Ukraine, the targeting of political opponents of the Russian actions, or anything to substantiate further their claims. The Board did not abuse its discretion in determining that the limited new evidence did not demonstrate a reasonable possibility that the petitioners could establish that *they* would suffer harm rising to the level of persecution. The Board made no mention of the additional claim in the affidavit that the changes in Ukraine could give rise to a claim based on political opinion. However, the petitioners' single line in an affidavit asserting such an entirely new factual basis for a claim, with no evidence to substantiate that it is a reasonable fear in light of current events, is not enough to have required the Board to act.

On the subject of reconsideration, the petitioners again did not demonstrate prior factual or legal error in the Board's decision. Instead, they essentially reassert their earlier arguments. The Board did not abuse its discretion in denying reconsideration.[27]

### Conclusion

The petitions for review are denied.

---

[27] The petitioners make a variety of arguments claiming that they were denied a fair hearing before an impartial arbiter. *See* Pet'rs' Br. 46. These arguments are conclusory in nature and therefore without merit.